20 533
59 507

---

### Roath and others *against* Driscoll.

Though a court of equity has the necessary power to restrain a party in the use of water, in a manner injurious to another; yet the court will not exercise this summary authority, where the right is doubtful, or the facts not definitely ascertained; it being the duty of the court rather to protect acknowledged rights, than to establish new and doubtful ones.

*A* had on his land a reservoir, made by excavating the ground a few feet below the surface, into which the water came, by percolation through the earth, and there it stood, in sufficient quantity for the use of his cattle; but it never rose to a level with the adjoining land. At a short distance from this reservoir, he made another excavation, calling it a well, in which the water stood some- what higher than in the former, but still never overflowed. By means of a

*New-London,*
July, 1850.

Roath
*v.*
Driscoll.

syphon, he then brought the water from the well into a cistern, from which he used and distributed it, to his profit. *B*, afterwards, made an excavation on his ground, in which water stood; the consequence of which was, that the water in *A's* well did not rise high enough to pass therefrom into his cistern; but *how* this effect was produced, the finding did not show. The acts of *B* were done for his own advantage, without any design unnecessarily to injure *A*. On a bill in chancery, brought by *A* against *B*, to restrain *B* in thus using the water, it was held, that *A*, by his prior use of water, *under ground*, acquired no exclusive right therein, as found, in or on *B's* land; the law of surface streams not being applicable to such water.

THIS was a bill in chancery, complaining of an injury to the plaintiffs, by means of a diversion of water, by the defendant, and asking for an injunction.

On a hearing before the superior court, at *Norwich, March* term, 1850, the court made the following finding of facts.

The plaintiffs now, and for a period of more than fifteen years next before the commencement of this suit, have ever been the owners of, and interested in, and in the lawful possession of, the lot or piece of land described in the bill, and the appurtenances thereof, in the manner and with the estate therein, as alleged in the bill. When the plaintiffs so became the owners of, and interested in said lot or piece of land, until they made the well hereafter mentioned, there was, and ever since has been, a reservoir of water, near the *North-East* corner of said lot or piece of land, which had been made artificially, by excavating the ground a few feet below its surface, and into which reservoir, when so excavated, the water came out of the ground, (and not by running thereinto from the surface of the ground,) and remained therein, to a certain heighth, and was a convenient watering-place for cattle; but the water, at the place where said reservoir was made, did not run naturally, nor would it, if said reservoir had not been excavated; and it did not, nor would it, after said excavation, rise to, or as high as, nor flow or run off from, or on, the surface of the ground there, after the plaintiffs so became the owners of, and interested in said lot or piece of land. And less than fifteen years before the acts of the defendant hereinafter mentioned, the plaintiffs, for the purpose of conveying the water, which then flowed in said reservoir, in an aqueduct, as hereafter mentioned, dug and made, at considerable expense, a well, a short distance *South-Westerly* from and higher than said reservoir; and after the well was so made,

the water, in consequence of the making of said well, ceased
to stand or remain in said reservoir, as it had before done; but after the making of said well, it flowed and stood therein.

The plaintiffs, after the making of said well, at considerable expense to them, caused to be constructed an aqueduct therefrom, consisting of subterranean pipes, in a *Westerly* direction, over the summit of a hill or rising ground, which is higher than the ground where said reservoir was made, to a cistern, built also afterwards by the plaintiffs, at considerable expense to them, where some of the plaintiffs resided; into which cistern the water from said well was conducted, by means of and through said aqueduct, on the principle of the *syphon*, the orifice of said aqueduct where it received the water from said well, being higher than where it discharged the water into said cistern; and having constructed said aqueduct and cistern, the plaintiffs contracted with sundry persons living in the vicinity of the cistern, to supply them with water, for domestic purposes, from said well, brought into said cistern, in consideration of a compensation agreed on, to be paid, by said persons respectively, to the plaintiffs therefor; and afterwards, and until the acts of the defendant, hereinafter mentioned, in pursuance of said contract, did supply such persons with water from said well, brought into said cistern, by means of said aqueduct, for their domestic purposes, and have received therefor a large sum of money, under the contract; and the water of said well, if it could be continued to be drawn by the plaintiffs, through said aqueduct into the cistern, would continue to be a source of great emolument and profit to them, in the compensation they might receive therefor, from said persons, and others whom the plaintiffs could supply with the water.

After the construction of said aqueduct and cistern, and while the plaintiffs were supplying said persons with water, as aforesaid, the defendant, having lawfully obtained possession of a tract of land, belonging to *Mary Meech* and *Lucy C. Kimmell*, lying *South* of, and contiguous to, the portion of the land of the plaintiffs where said reservoir was situated, and excavated and made a reservoir on said tract so possessed by the defendant, *Southerly* of, and near to, but horizontally lower in depth than said reservoir and well of the plaintiffs, into which reservoir of the defendant, after it was so

*New-London,*
*July, 1850.*

Roath
*v.*
Driscoll.

made, the water flowed out of and from the ground, but not from the surface of the ground, and stood therein, but at a less heighth than the surface of the ground, where said reservoir of the defendant was, and did not and would not flow therefrom, on the surface ; from which reservoir of the defendant, he has, since the making thereof, by means of an aqueduct constructed by him, conveyed the water therein off, in an *Easterly* direction, to the land adjoining other than said land of the plaintiffs, to whose land, said water hath not been, and cannot be, conveyed, through, or by means of, the defendant's aqueduct. The consequence and effect of the defendant's reservoir has been, that since the construction thereof, the water has not come into and stood at sufficient heighth in the plaintiffs' well, to enable them to take it from their well, by means of their aqueduct, and convey it to their cistern, the heighth of the water in the plaintiffs' well being so reduced in heighth, or lowered, in consequence of the defendant's reservoir, that the level of the water in the plaintiffs' well, has been lower than the *Westerly* end of their aqueduct, by which the water of their well has discharged into their cistern. Nor, since the making of the defendant's reservoir, would or will the water come and stand in the plaintiffs' well at sufficient heighth to enable them to convey the water from their well into their cistern, because the water in their well is, in consequence of the defendant's reservoir, so reduced in heighth, that it is impracticable for the plaintiffs to lengthen or lower the end of their aqueduct ; so that while the defendant's reservoir continues as it now is, and was built, the orifice of the plaintiffs' aqueduct, at their well (into which orifice the aqueduct should receive the water from the well,) shall be higher than the orifice thereof at the plaintiffs' cistern, from which last mentioned orifice the aqueduct of the plaintiffs, should discharge the water of their well into their cistern ; and the plaintiffs, therefore, since the construction, by the defendant, of his reservoir, have been, in consequence thereof, and will continue to be, unable to convey the water from their well, by means of their aqueduct, into their cistern, or to supply the persons, whom they had contracted to supply as aforesaid, with water from their well, as they had done before the making, by the defendant, of his reservoir, and as the plaintiffs might do, but for the making, by the defendant, of

his reservoir; and have lost, and are losing, and will continue <span style="float:right"><i>New-London,</i><br>July, 1850.</span> to lose, the profits and emoluments which would accrue to them from supplying said persons with water, as aforesaid, but for the defendant's reservoir.

<i>New-London,</i><br>July, 1850.<br>―――<br>Roath<br><i>v.</i><br>Driscoll.

But the court is not able, from the evidence, to find, and does not find, whether the water which flowed into the plaintiffs' said well, was interrupted and prevented from continuing to flow into the plaintiffs' well, by the defendant's reservoir, after the defendant's reservoir was built, or whether the water, which, before the making of the defendant's reservoir, flowed into the plaintiffs' well, would or did, naturally, first flow into the plaintiffs' well, and thence was, or would be, naturally, drawn or abstracted, by the defendant's reservoir; nor doth the court find, that the defendant made his reservoir, or his aqueduct therefrom, or did any of the acts by him done as aforesaid, for any improper or unnecessary purpose, or with any malicious or evil intention towards the plaintiffs, or for the purpose of injuring them. The water does not, and will not, naturally rise to the surface of the ground, where the plaintiffs' reservoir or well, or where the defendant's reservoir is made or located, and is obtained in said places, and made available for any useful purpose, only by excavating the ground at such places, and forming thereby a reservoir, receptacle, or basin, into which the water flows out of the ground, (but not from the surface thereof,) and stands in said reservoir, receptacle or basin, at a level lower than the top or surface of the ground, and does not rise to said surface; and hence the obvious difficulty, if not impracticability, of tracing, or ascertaining, with certainty or precision, the natural course or current of this subterranean water, or the manner in which it percolates through the lands of the plaintiffs and the defendant; it being only by percolation, that the water therein naturally runs and finds its way.

On the facts thus found, the case was reserved for the advice of this court, as to what decree should be made in the cause, or what course should be taken therein.

*Strong*, for the plaintiffs, contended, 1. That the plaintiffs had all the rights in the water of their reservoir, which any one could have in a natural spring on his own land. This was living water, which rose spontaneously, and was useful

and valuable to the plaintiffs ; and it was none the less their property, useful, or valuable to them, because it did not over-flow, or constitute a running stream.   Besides, they had been in the uninterrupted enjoyment of it, for more than fifteen years.

2. That the plaintiffs had the same rights in the water of their new reservoir or well, drawn by a syphon.   They might rightfully use it, as they best could, for their own benefit. They have none the less right to the water in the well, be-cause they had not used it, in that manner, for fifteen years.

3. That the defendant has *injured* the plaintiffs, by draw-ing off the water, so as to deprive them of the benefit of it. The court find the effect of the defendant's excavation to be, to abstract the water from the plaintiffs.   *How* this effect was produced, is not found, and cannot be ascertained, be-cause the passage was under ground, and not open to inspec-tion.   It is sufficient that the court have found the *fact* that the water was abstracted.

4. That this was an injury which entitled the plaintiffs to relief.   [The counsel here commented on the cases of *Thurs-ton* v *Hancock* & al. 12 *Mass. R.* 220. and *Greenleaf* v. *Francis*, 18 *Pick.* 117.]

5. That this was a proper case for an injunction.

*Foster*, contra, contended, 1.  That a party is not to be en-joined against a common right, without clear proof against him.

2. That the use of under-ground water, for fifteen years, gives no right to him who thus uses it, against an adjacent or other owner, who has not used it : this would not be deemed an *adverse* user.

3. That it does not appear from the finding of the court, that the defendant has injured the plaintiff in his aquatic rights. The court, in its finding, says expressly, that it does not find whether the water which flowed into the plaintiffs' well, was interrupted and prevented from continuing to flow into it, by the defendant's reservoir, or whether the water, which before the defendant's reservoir, flowed into the plaintiffs' well, would or did naturally flow into it, and thence was, or would be nat-urally drawn or abstracted, by the defendant's reservoir. And the reason why these facts are not found, is the impossi-

bility of ascertaining the course of streams of water under <span style="float:right">*New-London,*<br>July, 1850.</span> ground.

4. That the facts which were found, did not entitle the <span style="float:right">Roath<br>*v.*<br>Driscoll.</span> plaintiffs to a decree in their favour. If otherwise, a man can be enjoined against digging a well, and using the water, on his own land, on the mere suggestion that an adjacent land-owner wishes that well filled up, so that the water may rise on his own land. This can never be done. *Greenleaf* v. *Francis,* 18 *Pick.* 117. *Acton* v. *Blundell.* 12 *Mees. &amp; Wels.* 324. *Lasala* v. *Holbrook,* 4 *Paige* 169 *Thurston* v. *Hancock* &amp; al. 12 *Mass. R.* 220.

ELLSWORTH, J. This is an application to a court of equity, to prevent the defendant from using a certain reservoir of water, situate upon his premises.

The court, doubtless, possesses the necessary power; but it is not to be exercised as a matter of course, even when the plaintiff suffers some injury to his real estate. Whenever the right is doubtful, or needs the investigation of a jury, upon facts in dispute, a court of equity is always reluctant to inter-pose its summary authority; for it is rather the duty of the court to protect *acknowledged rights,* than to establish new and doubtful ones.

We think the case, even if its merits were less equivocal than they are, belongs to that class which renders the inter-position of equity inexpedient and questionable: its multifari-ous and peculiar facts commend it to a legal investigation.

But as the case has been discussed on its broadest merits, and is one of novelty, and some practical importance, we are not unwilling, in giving judgment, to pass upon these merits, and, if possible, put an end to the subsisting controversy.

It appears, that the plaintiffs, for more than fifteen years before the commencement of this suit, were the owners of a reservoir of water, situate in the *North-East* corner of their lot, made by excavating the ground a few feet below the sur-face. In this reservoir, water stood, sufficient for the use of the plaintiffs' cattle; but there never was any stream of water running into or from it. The water percolated through the earth, but never rose to a level with the adjoining land. Within fifteen years before this suit, the plaintiffs had opened another reservoir, at a short distance from the first, which they

call a *well,* which was of the depth of a few feet, and at a place higher up the hill than the first. The water stood in the well somewhat higher than it did in the first reservoir, but never rising so as to run off; and no stream was known to run into it. The plaintiffs inserted an aqueduct into the well to carry water, upon the principle of the syphon, over higher ground, to a large cistern on other land, to supply themselves and their neighbours with fresh water, which they did at considerable pecuniary profit.

Recently, the defendant, on his lot adjoining the plaintiffs', made a small excavation, in which the water appears, and stands naturally at a level below the water in the plaintiffs' well; but no stream naturally runs into or from the defendant's said basin; nor does the water rise to the surface of the land. From this basin the defendant, by a trough, carries the water to his lands adjoining.

It is found, that the defendant is acting from honest motives to advance his interests, without any design unnecessarily to injure the plaintiffs.

It is further found, that since the defendant made his basin as aforesaid, the consequence and effect has been, that water has not entered and stood at sufficient height in the plaintiffs' well, to enable them to draw water through their pipes to their cistern. This is the injury complained of.

Now, although this effect is found to result from the defendant's acts, yet it is not found, *how* this is the result; and the judge expressly says, he is not able to find, whether the water, which before entered the defendant's well, was interrupted and prevented from passing into the well, by reason of the defendant's basin; or whether the water would naturally first pass into the basin, and then into the plaintiffs' land; nor indeed where was the origin of the water, or what its progress, or manner of percolating through the earth, nor where was its natural outlet, if there was any at all.

Now, two things are to be observed, in deciding upon the foregoing facts; first, to lay out of the case any artificial use of water, for more than fifteen years, by which the plaintiffs have acquired a new right; for the plaintiffs' well, which has caused their first reservoir to become dry, (as is the fact,) is of less than fifteen years standing; and secondly, the mode

of the injury cannot be ascertained from testimony in the *New London,*
*July, 1850.* case.

Roath
*v.*
Driscoll.

The case, when viewed most favourably for the plaintiffs, is simply this. Have they, by mere prior occupancy, acquired an advantage over the defendant, in the use of this water? Or, in other words, can one of two adjoining proprietors, by first opening a watering place, prevent other persons from doing the same, on their own land; though by so doing, water is prevented from percolating the land so as to supply the first made reservoir.

We have already said, that *this* case does not involve a right acquired, by artificial use for fifteen years; but in the following reasons it will appear, that as to adjoining proprietors who open the earth for reservoirs of water, this distinction is not the rule; for nothing is gained, by a mere continued preöccupancy of water *under the surface.* Why should any advantage be gained, by preöccupancy? Each owner has an equal and complete right to the use of his land, and to the water which is *in it.* Water combined with the earth, or passing through it, by percolation, or by filtration, or chemical attraction, has no distinctive character of ownership from the earth itself; not more than the metallic oxids of which the earth is composed. Water, whether moving or motionless *in the earth,* is not, in the eye of the law, distinct from the earth. The laws of its existence and progress, while there, are not uniform, and cannot be known or regulated. It rises to great heights, and moves collaterally, by influences beyond our apprehension. These influences are so secret, changeable and uncontroulable, we cannot subject them to the regulations of law, nor build upon them a system of rules, as has been done with streams upon the surface. Priority of enjoyment does not, in like cases, abridge the natural rights of adjoining proprietors. No one, building upon the line of his lot, can prevent his neighbour from digging a cellar, though thereby his building may be seriously endangered and injured. These principles are elaborately discussed and decided in *Thurston* v. *Hancock,* 12 *Mass. R.* 220. *Panton* v. *Holland,* 17 *Johns. R.* 92. *Callender* v. *Marsh,* 1 *Pick.* 434. *Lasala & al.* v. *Holbrook,* 4 *Paige,* 169. *Wyatt* v. *Harrison,* 3 *B. & Adol.* 871. (23 *E. C. L.* 205.) *Greenleaf* v. *Francis,* 18 *Pick.* 117.

*New-London,*
*July, 1850.*

*Roath*
*v.*
*Driscoll.*

Further, we may say, that, by general consent of mankind, which is to be inferred from the nature of the right itself, each person must be left to enjoy any natural advantage belonging to his own land ; and water, appearing and standing, either naturally or by artificial means, but never constituting a running stream, is such a natural advantage ; were it otherwise, one man, by sinking a well, though comparatively unimportant, might prevent the sinking of other wells, and the improvement of the neighbourhood, by draining marshes, &c., and even the opening of mines of metal or coal ; as the water might not percolate, with the same freeness or abundance as before. Besides, no man is bound to know that his neighbour's well is supplied, by water percolating his own soil ; and he ought not, therefore, to be held to lose his rights, by such continued enjoyment. He cannot know that the first well requires any other than the natural and common use of water under the surface ; nor can he know from whence the water comes ; nor by what means it appears in one place or the other ; nor which of the persons who first or afterwards opens the earth, encroaches upon the right of the other. The law has not yet extended beyond *open running* streams.

Nor can any light be obtained from the law of surface streams. Such streams are recognized as *private property :* and their use is regulated by principles of obvious equity and necessity. Their *nature* is defined ; their *progress* over the surface *seen,* and *known,* and *uniform.* They are not in the secret places of the earth, and a part of it ; nor is there any secresy in the influences which move them. As soon as they appear and pass over the surface, they assume a distinct character, and are subject to the great law of gravitation. The purchaser of land knows what he purchases, and what controul he can exercise over such a stream, and what are the rights of those above or below him. Each may use them as the common atmosphere ; but none can injuriously interrupt their progress, or render them unfit for common use. Their laws are as fixed and public, as the laws of freehold estates. But what are the laws of water percolating in the earth ? Speaking on this subject, Ch. J. *Tindal* says, in *Acton* v. *Blundell,* 12 *M. & W.* 348., " The ground and origin of the law which governs streams running in their natural course, would seem to be this ; that the right enjoyed by the

*New-London,*
July, 1850.
_____
Roath
*v.*
Driscoll.

several proprietors of the lands over which they flow, is, and always has been, public and notorious; that the enjoyment has been long continued, indeed, time out of mind, and uninterrupted, each man knowing what he receives, and what has always been received, and what he transmits, and what has always been transmitted, to the lower. The rule, therefore, either assumes for its foundation the implied assent and agreement of the proprietors of the different lands from all ages; or perhaps it may be considered as a rule of positive law, the origin of which is lost, by the progress of time; or it may not be unfitly treated, as laid down by Mr. Justice *Story*, as an 'incident to the law;' and that whoever seeks to found an exclusive use, must establish a rightful appropriation, in some manner known and admitted by the law. But in the case of a well, sunk by a proprietor in his own land, the water which feeds it from a neighbouring soil, does not flow openly in the sight of the neighbouring proprietor, but through the hidden veins of the earth, beneath its surface. No man can tell what changes these under-ground sources have undergone, in the progress of time; it may well be, that it is only of yesterday's date that they first took the course and direction which enabled them to supply the well.

"Again, no proprietor knows what portion of water is taken from beneath his own soil; how much he gives originally, or how much he transmits only, or how much he receives. On the contrary, until the well is sunk, and the water collected, by draining into it, there cannot properly be said, with reference to the well, to be any flow of water at all.

"In the case, therefore, of the well, there can be no ground for implying any mutual consent or agreement, for ages past, between the owners of the several lands beneath which the under ground springs may exist, which is one of the foundations on which the law, as to running streams, is supposed to be built. Nor for the same reason, can any trace of a positive law be inferred from long continued acquiescence and submission, whilst the very existence of the underground springs, or of the well, may be unknown to the proprietors of the soil."

The case of *Greenleaf* v. *Francis*, is like the case on trial. This is the marginal summary or note: " In the absence of all right, acquired by grant, or adverse use for twenty years,

the owner of land may dig a well on any part thereof, notwithstanding he thereby diminishes the water in his neighbour's well, unless in so doing, he is actuated by a mere malicious intent to deprive his neighbour of water."

We advise that the plaintiffs'. bill be dismissed.

The other Judges were of the same opinion.

Bill dismissed.