G. T. BARGER v. C. E. BARRINGER.

(Filed 15 December, 1909.)

**1. Private Nuisance — Light and Air — "Spite Fence" — Motive — Damages.**

Ordinarily the owner of lands may erect such improvements thereon as he sees fit, and any resultant injury to the adjoining owner is *damnum absque injuria;* but he may not, without liability as for a private nuisance, erect an unsightly "spite fence" on his own land for the sole malicious purpose and effect and without benefit to himself, of shutting out the light and air from his neighbor's windows.

**2. Same—Prescriptive Rights.**

Plaintiff and defendant had erected a wire divisional fence between their adjoining lands whereon they resided, and thereafter the plaintiff, as chief of police of the town, reported, in accordance with his official duty, the filthy condition of defendant's stable. From vengeance and malice, and without benefit to himself, the defendant then erected a very rude and unsightly board fence eight feet, six inches high on his own side of the division fence, within four feet of plaintiff's window, so as to shut out his view, light and air therefrom. *Held,* that though a prescriptive right in light and air cannot be acquired, the defendant's motive in constructing the fence in the manner indicated can be considered, and he will be liable in damages as for maintaining a private nuisance.

APPEAL from *Justice, J.,* May Term, 1909, of CATAWBA, heard on appeal from a justice of the peace to the Superior Court.

The action was brought to recover damages for the malicious, useless and unlawful erection of a high board fence, commonly called a "spite fence," on defendant's lot, immediately adjoining plaintiff, for the sole purpose of cutting off light and air from plaintiff's windows. At the close of the evidence, his Honor, being of opinion that plaintiff could not recover, granted defendant's motion to nonsuit, and plaintiff appealed.

The facts are stated in the opinion of the Court.

*A. A. Whitener* for plaintiff.
Defendant not represented in this Court.

BARGER v. BARRINGER.

BROWN, J. ·The plaintiff's evidence in this case tends to prove that the premises of plaintiff and defendant adjoin, and that they mutually constructed a four-foot wire fence on the division line; that thereafter the plaintiff, as chief of police of the town of West Hickory, was compelled by his duty to report the filthy condition of defendant's stables; that, from pure, unadulterated vengeance and malice, the defendant erected a very rude, unsightly board fence, eight feet six inches high, on his side of the division fence and within four feet of plaintiff's windows, which cuts off plaintiff's view, air and light, so much so that plaintiff testifies he cannot see how to shave by sunlight since the fence was built.

His Honor's ruling was based upon what we admit to be the generally received view of the common law of England, that the erection of a fence upon one's own land is not an actionable injury to one's neighbor, although he may be deprived of light and air thereby and the act may·be dictated by motives of ill will. Counsel for plaintiff does not deny the general proposition that one has a right to improve his property as he sees fit, and that resultant injury would be *damnum absque injuria*. But it is contended that if one in the use of his property·is actuated solely by a malicious purpose to injure his neighbor, with no benefit accruing to himself, he will not be permitted to use his property for such an unworthy purpose.

It must be admitted that this position embodies good morals, and we think it is supported by recognized authority and well-considered precedent. We·are therefore disposed to follow those courts which in this respect teach that the principle of the common law above stated should not be held to authorize the creation and maintenance of a nuisance for the sole purpose of gratifying a most ignoble passion. There·are respectable authorities in this country which support the view that malice makes that actionable which would otherwise not be so, and the doctrine has been held to be well founded, both in law and morals, that "a fence erected maliciously and with no other purpose than to shut out the light and air from a neighbor's window is a nuisance." 12 Am. & Eng. Enc., 1058, and cases cited in note; 1 Cyc., 789.

This question came before the Supreme Court of Michigan in 1888 and the court was equally divided. An elaborate and well-reasoned opinion was delivered by *Justice Morse* (69 Mich., 383), from which we cannot do better than quote at length. The learned Justice says: "It is argued that, while it is true that when one pursues a strictly legal right, his motives are immaterial, yet no man has a right to build and maintain an entirely

useless structure for the sole purpose of injuring his neighbor. The argument has force and appears irresistible in the light of the moral law that ought to govern all human action. And the civil law, coming close to the moral law, declares that he who, in making a new work upon his own estate, uses his right without trespassing, either against any law, custom, title or possession which may subject him to any service towards his neighbors, is not answerable for the damages which they may chance to sustain thereby, unless it be that he made that change merely with a view to hurt others without advantage to himself. Thus the civil law recognizes the moral law, and does not permit the owner of land to do an act upon his own premises for the express purpose of injuring his neighbor, where the act brings no profit to himself. The law furnishes redress, because the injury is malicious and unjustifiable. The moral law imposes upon every man the duty of doing unto others as they would that they should do unto him; and the common law ought to and, in my opinion, does require him to so use his own privileges and property as not to injure the rights of others maliciously and without necessity. It is true that he can use his own property, if for his own benefit or advantage, in many cases, to the injury of his neighbor; and such neighbor has no redress, because the owner of the property is exercising a legal right which infringes on no legal right of the other. Therefore, and under this principle, the defendant might have erected a building for useful or ornamental purposes and shut out the light and air from complainant's window; but when he erected these screens or obscurers for no useful or ornamental purpose, but out of pure malice against his neighbor, it seems to me a different principle must prevail. I do not think the common law permits a man to be deprived of water, air or light for the mere gratification of malice. No one has an exclusive property in any of these elements, except as the same may exist or be confined entirely on his own premises."

This opinion was approved by a unanimous court, the *personnel* of which had been changed in 1890, in the case of *Flaherty v. Moran*, 81 Mich., 52, in which it is held that a fence erected maliciously and with no other purpose than to shut out light and air from a neighbor's windows is a nuisance. This ruling was again unanimously approved in 1893 by the Michigan Court, although its membership had again been changed, in *Kirkwood v. Finegan*, 95 Mich., 543, and again in *Kuznak v. Kozminsky*, 107 Mich., 444. In 1896 the same court, again differently constituted, unanimously followed and approved those precedents. *Peak v. Roe*, 110 Mich., 52; *Sanky v. Academy*, 8 Mont., 267;

*Havens v. Klein,* 49 How. Pr., 95. The same principle has been applied by other courts where the owner of land upon which there is an underground spring of water attempts to cut off the underground flow from his neighbor.

It is held generally that any person may rightfully appropriate the whole of the water from the spring on his own land, or of water which percolates through it, without forming a well-defined stream. Hale on Torts, p. 425; *Roath v. Driscol,* 20 Conn., 533.

Nevertheless there are able courts which hold that if such appropriation is maliciously done to injure a neighbor, it is actionable. Hale, p. 426; *Whitley v. Baugh,* 25 Pa. St., 528, and cases cited. In this last case *Chief Justice Lewis* quotes the same extract from the civil law (Domat, sec. 1047) quoted by *Justice Morse,* and says "these principles of the civil law are the recognized doctrines of the common law." In a strong opinion in *Greenleaf v. Francis* the Massachusetts Court holds that the owner of land may dig a well on any part of it, notwithstanding he thereby diminishes the water in his neighbor's well, unless in doing so he is actuated by a mere malicious intent to deprive his neighbor of the water without benefit to himself. 18 Pickering, 117.

In commenting on this case *Chief Justice Lewis* says: "Neither the civil law nor the common law permits a man to be deprived of a well or spring or stream of water for the mere gratification of malice. The reason is that water, like air, is of such a nature that no man can have an exclusive right to it."

This doctrine is approved by the Supreme Court of Maine in an elaborate opinion citing the above cases. *Chesley v. King,* 74 Me., 177. In that case the defendant dug a well on his own land, as alleged, solely to injure plaintiff, without benefit to himself. The court, recognizing the defendant's paramount rights, says: "It cannot be regarded as a maxim of universal application that malicious motives cannot make that a wrong which in its own essence is lawful." The court further says: "We think this plaintiff had rights in that spring which, while they were completely subject to the defendant's right to consult his own convenience and advantage in the digging of a well in his own land for the better supply of his own premises with water, should not be ignored if it were true that defendant did it 'for the mere, sole and malicious purpose' of cutting off the source of the spring and injuring the plaintiff, and not for the improvement of his own estate."

*Judge Cooley* also recognizes that malice makes a decided dif-

ference when human actions, otherwise lawful, are weighed in the scales of justice. "If a discomfort is wantonly caused from malice or wickedness, a slight degree of inconvenience may be sufficient to render it actionable." Torts, 596.

Mr. Washburne, in his treatise on Easements, quotes with favor *Wheatley v. Baugh,* and says: "Neither the civil nor the common law permits a man to be deprived of a spring or stream of water for the mere gratification of malice." We fail to see why this principle should not apply with equal force to light and air, especially in a State where no prescriptive rights can be acquired in windows.

*Justice Morse,* in his admirable opinion already cited, asks this pertinent question: "If a man has no right to dig a hole upon his premises, not for any benefit to himself or his premises, but for the express purpose of destroying his neighbor's spring, why can he be permitted to shut out air and light from his neighbor's windows, maliciously and without profit or benefit to himself?"

Light and air are as much a necessity as water, and all are the common heritage of mankind. While, for legitimate purposes, a person's rights in them may sometimes be curtailed without consulting his comfort or convenience, the common welfare of all forbids that this should be needlessly permitted in order to gratify one of the basest and most degrading passions that sometimes take possession of the human heart.

The law would be untrue to its soundest principles if it declared that the wanton and needless infliction of injury can ever be a legal right.

Instead of saying that malice will not make a lawful act unlawful, it is much more consistent with elementary principles of right and wrong to say that willful and wanton damage done to another is actionable unless there is some just or legal cause or excuse for it. An eminent English judge has declared this to be a general rule of English law, in these words: "At common law there was a cause of action whenever one person did damage to another willfully and intentionally and without just cause or excuse." *Lord Justice Bowen,* in *Skinner v. Shew* (1893), 1 Ch., 422.

*Mr. Justice Holmes,* delivering the opinion of the Supreme Court of the United States, stated the same rule more fully: "It has been considered that *prima facie* the intentional infliction of temporal damage is a cause of action which, as a matter of substantive law, whatever may be the form of pleading, requires a justification, if the defendant is to escape. . . . If this is

the correct mode of approach, it is obvious that justifications may vary in extent according to the principles of policy upon which they are founded; and, while some, for instance, at common law, those affecting the use of land, are absolute, others may depend upon the end for which the act is done." *Aikens v. Wisconsin,* 195 U. S., 194; Pollock on Torts (7th Ed.), 319. See, also, Law Quarterly Review, 1906, p. 118.

In the administration of the criminal law the motive with which an act is committed has a marked effect upon the guilt of the accused and in determining the degrees of crime. Why not, for the same reasons, let it become a potent element in determining civil rights, so as to deter malicious persons from the infliction of wanton injury upon their fellow-men?

This involves no harmful restriction upon the right of ownership of property. There are many limitations placed by the common law upon such rights, and we see no difficulty in principle in limiting an owner's rights so far that he shall not be permitted to use his land in a particular way, with no other purpose than to damage his neighbor. This has been done without injurious effect in the matter of so-called "spite fences" by some of the most enlightened States of this Union, which have remedied by legislation the errors of the courts in failing to recognize this "fundamental doctrine of the rights of man" when dealing with this kind of injury.

In cases brought under such statutes the courts have declared that *malevolence* must be the dominant motive, without which the fence would not have been built, in order to bring the case within the statute. 12 Am. & Eng. Enc., 1058, and cases cited; *Lord v. Langdon,* 91 Me., 221; *Rideout v. Knox,* 148 Mass., 368; *Smith v. Morse,* 148 Mass., 407; *Hunt v. Coggin,* 66 N. H., 140.

If the right to use one's property solely for malicious purposes, in a manner which would be lawful for other ends, is a legal right and an incident to the legal exercise of such property, which the courts ought not and cannot rightfully deny, how can such right be taken away by legislation, as legislatures, no more than courts, have power of confiscation? Yet those statutes have been upheld by the courts and approved by the people of those States wherein they have been enacted.

The truth is that the right to use one's property for the sole purpose of injuring others is not one of the immediate and indestructible rights of ownership, and such acts may and ought to be prohibited by courts without the aid of legislation. Such rights are established for very different ends, and, as is said by *Justice Holmes,* in *Rideout v. Knox, supra,* "It has been thought

by most respectable authorities that, even at common law, the
extent of a man's rights in cases like the present, might depend
upon the motive with which he acted," citing with approval
*Greenleaf v. Francis, supra; Carson v. Railroad,* 8 Gray, 423;
*Rooth v. Driscoll,* 20 Conn., 533; *Swett v. Cutts,* 5 N. H., 439,
and *Wheatley v. Baugh, supra.*

In an action brought under the statute of Connecticut, the
Supreme Court of that State recognizes a right of action at com-
mon law for damages by saying: "Where one, from pure malice,
shuts air and light from his neighbor's dwelling, this statute
obviously intends to give the injured person more effective and
speedy relief than comes from successive and long-delayed actions
at law for damages." *Harbison v. White,* 46 Conn., 108.

In commenting upon the enactment of such statutes, *Mr. Jus-
tice Morse* says, with much force: "It is said that the adoption
of statutes in several of the States, making this kind of injury
actionable, shows that the courts have no right to furnish the
redress without statutory authority. It has always been the
pride of the common law that it permitted no wrong with dam-
age, without a remedy. In all the cases where this class of
injuries have occurred, proceeding alone from the malice of the
defendant, it is held to be a wrong accompanied by damage.
That courts have failed to apply the remedy has ever been felt a
reproach to the administration of the law; and the fact that the
people have regarded this neglect of duty on the part of the
courts so gross as to make that duty imperative by statutory law,
furnishes no evidence of the creation of a new right or the giving
of a new remedy, but is a severe criticism upon the courts for an
omission of duty already existing and now imposed by statute
upon them, which is only confirmatory of the common law."
*Burke v. Smith,* 69 Mich., at p. 389.

We are aware that this Court has recognized the general prin-
ciple that malice disconnected with the infringement of a legal
right is not actionable, as in *Richardson v. Railroad,* 126 N. C.,
100, where the master discharged his servant, there being no
fixed term of employment. It was properly held, the present
Chief Justice speaking for the Court, that as either party had
the legal right to terminate the service at will, the motive could
not be inquired into.

We also adhere to the law, as declared in *Lindsey v. Bank,* 115
N. C., 553, that in this country the easement of light and air
cannot be acquired by prescription, upon which ground this
Court refused to enjoin the erection of a building, one wall of
which excluded the light from plaintiff's photograph gallery.

BARGER *v.* BARRINGER.

There was no allegation that the obstruction was useless and erected for malicious purposes solely. The difference between these cases and this is apparent upon even a cursory reading.

We are not aware that this Court has ever extended the rights of ownership in property so far as to authorize an owner to use it for the express purpose of creating a nuisance, and no other; and if it had, in the light of further investigation, we should feel impelled to hold the case not well decided. There are many annoyances arising from *legitimate improvements* and businesses which those living near must endure, but no one should be compelled by law to submit to a nuisance created and continued for no useful end, but solely to inflict upon him humiliation as well as physical pain.

The ancient maxim of the common law, *Sic utere tuo ut alienum non laedas,* is not founded in any human statute, but in that sentiment expressed by Him who taught good will toward men, and said, "Love thy neighbor as thyself." Freely translated, it enjoins that every person, in the use of his own property, should avoid injury to his neighbor as much as possible.

No one ought to have the legal right to make a malicious use of his property for no benefit to himself, but merely to injure his fellow-man. To hold otherwise makes the law an engine of oppression with which to destroy the peace and comfort of a neighbor, as well as to damage his property for no useful purpose, but solely to gratify a wicked and debasing passion.

The doctrine of private nuisances is founded upon this humane and venerable maxim of the law. If it can be successfully invoked to prevent the keeping of stables and hogpens so near one's neighbor as to cause discomfort, why cannot he whom it is sought to needlessly and maliciously deprive of air and sunlight also seek the *aegis* of its protection?

The right thus to injure one's neighbor with impunity cannot long continue to exist anywhere in an enlightened country where God is acknowledged and the Golden Rule is taught. On this subject, if need be, we will do better to follow the pandects of the heathen Romans, whose jurists have inculcated a doctrine more consistent with the teachings of Him whom they permitted to be crucified than to be governed by the principles of the common law as expounded by some Christian courts and text-writers.

The judgment of nonsuit is set aside and the cause remanded, to be proceeded with in accordance with the principles laid down in this opinion.

New trial.

HOKE, J., dissenting: It is accepted doctrine with us that the easement of light and air as appurtenant to the ownership of a given piece of property does not arise except by grant or contract, expressed or fairly implied from the circumstances of the transaction. Such an easement does not exist as an ordinary incident of ownership, nor can it be acquired by prescription or adverse user.

The last decision upholding this position was that of *Lindsay v. Bank,* 115 N. C., 553. In that case the defendant, the owner of an adjoining piece of property, had erected a building which entirely shut off the light from a photograph gallery and rendered the latter entirely unfit for the purpose indicated. Recovery was denied, and *Avery, J.,* delivering the opinion, said: "The easement of light and air cannot be acquired, according to the general current and weight of authority, in this country, even by prescription; and, of course, no right to object to the obstruction of one's windows by a wall erected on the land of an adjacent owner can be said to exist independently of the English doctrine," citing the Amer. & Eng. Enc. in support of the position.

In the publication referred to (19 Amer. & Eng. Enc., at p. 118) it is said: "The English doctrine of ancient lights above stated has not been adopted to any extent in the courts of the United States, which are practically unanimous in holding that no right to light and air can be acquired by prescription or adverse user."

And in this same work (p. 121) it is said: "Even where the right to light and air is recognized, this does not include the right to view or prospect, however much this may contribute to the enjoyment of the estate. And the general rule is that no action can be maintained by one property owner against another for cutting off his view, unless the right of action is given by statute."

This being the recognized doctrine with us, the present suit can only be maintained, if at all, by reason of the fact that the erection of the fence in question, entirely on the land of the defendant, was prompted by a malicious motive. The principal opinion frankly rests its approval of plaintiff's case on the ground stated, and, that being true, I am constrained to dissent from the position of the Court, believing that such a decision is wrong in principle, unwise in policy and contrary to the great weight of well-considered authority.

In countries like ours, which base their system of jurisprudence on the principles of the common law, it is very generally

held that no actionable wrong can arise unless there has been some invasion of another's right, and without this essential feature a person's conduct cannot be made the subject of a suit in the municipal courts, though it may have caused damage to another, and though it may have been prompted solely by malicious motives. In Broom's Legal Maxims the author, in treating of "fundamental principles," thus refers to the question presented : "So a man may lawfully build a wall on his own ground in such a manner as to obstruct the lights of his neighbor, who may not have acquired the right to them by grant or adverse user ; so he may obstruct the prospect from his neighbor, etc., etc. In this and similar cases the inconvenience caused to his neighbor falls within the description of *damnum absque injuria,* which cannot become the ground for an action. And, although it may seem to be a hardship upon the party injured to be without a remedy, by that consideration courts of justice ought not to be influenced. Hard cases, it has been already observed, are apt to introduce bad law."

And that this principle is not affected by the presence or absence of a malicious motive will be found approved and sustained in *Oglesby v. Attrill,* 105 U. S., 605; *Land Co. v. Commission Co.,* 138 Mo., 445; *Hunt v. Simmons,* 19 Mo., 583; *Kelly v. Railroad,* 93 Iowa, 436-452; *Iron Co. v. Uhler,* 75 Pa. St., 467; *Smith v. Johnson,* 76 Pa. St., 196; *Phelps v. Walker,* 72 N. Y., 45; *Ratcliff v. Mayor,* 4 N. Y., 200; *Mahan v. Brown,* 13 Wendell, 261; *Piscard v. Collins,* 25 Barber, 444-459; *Boulier v. McCauley,* 91 Ky., 135; *McCune v. Gas Co.,* 30 Conn., 524; *Walker v. Cronin,* 107 Mass., 556-564; *Mfg. Co. v. Hollis,* 54 Minn., 253; *Transportation Co. v. Oil Co.,* 50 W. Va., 611; *Lancaster v. Hamberger,* 70 Ohio St., 156, reported with annotation in 1st A. & E. Anno. Cases, 249; *Bank v. Bank,* 21 Vt., 535; *Raycroft v. Taintor,* 68 Vt., 219; *Guarantee Co. v. Horne,* 206 Ill., 403, and numerous other decisions of recognized authority.

To make a few citations from the cases mentioned, in *Iron Co. v. Uhler, supra,* it is held, among other things, "That a lawful act is not actionable, though it proceeded from a malicious motive."

In *McCune v. Gas Co., supra,* Sanford, J., delivering the opinion, said : "The allegation that the defendant cut off the supply of gas maliciously and wantonly and with intent to injure the plaintiff is of no importance in the determination of this question. Where a party has a legal right to do a particular act at pleasure, the motive which induced the doing of the act at the time in question can never affect his legal liability for the act,

to whatever effect such motive may have upon the *quantum* of damages when his liability is fixed."

In *Walker v. Cronin, supra, Wells, J.,* delivering the opinion, and in reference to the question we are discussing, said: "One may dig upon his own land for water or any other purpose, although he thereby cuts off the supply of water from his neighbor's well (citing *Greenlee v. Francis,* 18 Pickering, 117). It is intimated in this case that such acts might be actionable if done maliciously, but the rights of the owner of the land being absolute therein, and the adjoining proprietor having no legal right to a supply of water from the lands of another, the superior right must prevail. Accordingly, it is generally held that no action will lie against one for acts done upon his own land in the exercise of his rights of ownership, whatever the motive, if they merely deprive another of advantages or cause a loss to him without violating any legal right."

And in *Transportation Co. v. Oil Co., supra,* it was held: "A legal right must be invaded in order that an action for tort may be maintained. The mere fact that the complainant may have suffered damage of a kind recognized by law is not sufficient, as there must also be a violation of a duty which the law recognizes."

In regard to buildings and other superstructures affecting light and air, I find no American decisions in opposition to the principle sustained by these authorities, except those in the Supreme Court of Michigan. A contrary doctrine seems to have been engrafted upon the jurisprudence of that State, though it was originally established by a divided court in *Burke v. Smith,* 69 Mich., p. 380. In that case two of the judges, Campbell and Champlin, dissented. *Judge Campbell* filed a forcible and learned opinion, and *Judge Champlin,* concurring with *Judge Campbell,* thus tersely states his position: "The decisions have been quite uniform to the effect that the motive of a party in doing a legal act cannot form the basis upon which to found a remedy against such party. Under these circumstances, it should be left to the Legislature to define and prohibit the act and declare a remedy, as has been recently done in Massachusetts, Vermont and some of the other States."

In the case of *Sanky v. Academy,* 8 Montana, 265, sometimes cited as being in accord with the Michigan decisions, it will be found that the defendant had constructed a fence on the plaintiff's side of a common alley, and the decision was made to rest upon the fact that there had been a wrongful invasion of plaintiff's right.

And several of the other citations made and relied upon in the opinion of the Court not only fail to give it support, but are directly contrary to the position maintained. Some of them, as in *Aikens v. Wisconsin,* 195 U. S., 194, were actions upon statutes affecting the question, and the fact that legislation was enacted on the subject gives indication that such action was required, and that without it no suit would lie. Others, as in *Wheatley v. Ball,* 25 Pa. St., 528, were suits for injuries caused by interrupting the flow of underground water having a well-defined channel and in which the owner of the servient tenement has some legal rights not to be interfered with, except in the reasonable user of the dominant tenement; and the case of *Chestley v. King,* 74 Me., may also be upheld upon the same principle. See Gould on Waters (3d Ed.), sec. 290, where the case of *Greenleaf v. Frances,* also relied upon in the principal opinion, is said to have been overruled on the question presented by the subsequent case of *Walker v. Cronin, supra,* and the author says that the doctrine announced in this last case is a settled law as to percolating water.

And in the citation to 1st Cyc., 789, in the opinion of the Court, the entire section is as follows: "If an erection which deprives the adjoining owner of light and air is lawful, it is not *per se* a nuisance, and the law will not inquire into the motive with which the erection was made. It has been held, however, that obstruction by one owner with intent to injure his neighbor, and without any advantage to himself, is unlawful." The last clause being predicated upon the Michigan decision, above adverted to.

And in 12 A. & E., also referred to in the principal opinion, the statement is as follows: "According to the recent view of the common law, the erection of a fence upon one's own land is not an actionable injury to one's neighbor, although the erection may deprive him of light and air and may be dictated by motives of ill will. Special liability may, however, arise where title to the interrupted enjoyment of light and air has been acquired by contract; and in England, and perhaps one or two American jurisprudences by prolonged user, under the doctrine of ancient lights. There are some authorities of the United States which support a contrary rule with which malice makes that actionable which would otherwise not be so, and a doctrine has been declared that a fence erected maliciously and with no other purpose than to shut out the light and air from a neighbor's window is a nuisance," citing for the last position the Michigan decisions and the Montana case, above referred to.

The doctrine as established in England will be found to accord with what I consider the overwhelming weight of American authority, as above indicated. See *Chastmore v. Richards,* 7 House of Lords, p. 349 and 388; *Allen v. Flood,* Appeal Cases 98, p. 1. In this last case *My Lord Watson,* in his opinion, thus states what is to my mind the correct principle, as follows: "Although the rule may be otherwise with regard to crimes, the law of England does not, according to my apprehension, take into account motive as constituting an element of civil wrong. Any invasion of the civil rights of another person is itself a legal wrong, carrying with it liability to repair its necessary and natural consequence, in so far as these are injurious to the person whose right is infringed, whether the motive which prompted it be good, bad or indifferent. But the existence of a bad motive in the case of an act which is in itself not illegal will not convert that act into a civil wrong for which reparation is due."

A like doctrine prevails in Canada, as announced in *Perrault v. Gauthier,* 28 Can., 241. And text writers of approved excellence are to like effect. Thus, in Cooley on Torts, p. 1503, marginal p. 830, the author says: "In the course of the preceding pages it has been made very manifest that when the question at issue is whether one person has suffered legal wrong at the hands of another the good or bad motive which influenced the action complained of is generally of no importance whatever. What was said in the opening chapter of the work, that the exercise by one man of his legal right cannot be a legal wrong to another, has been abundantly shown to be justified by the authorities, even if it were not in itself a mere truism. 'An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent.' 'Any transaction which would be lawful and proper if the parties were friends cannot be made the foundation of an action merely because they happened to be enemies. As long as a man keeps himself within the law by doing no *act* which violates it, we must leave his motives to Him who searches the heart.' To state the point in a few words, whatever one has a right to do, another can have no right to complain of."

And Jaggart on Torts, p. 55, says: "A mere intent to do wrong, or mere malice not resulting in conduct which violates a right or duty, is not actionable." See, also, Pollock on Torts, p. 152.

There are no decisions more pronounced than our own in maintaining the doctrine that malice will not of itself constitute an action where there has been no invasion of another's rights.

Thus, in *White v. Kincaid,* 149 N. C., 415, in the opinion, at
p. 419, the Court said: "It is a principle well established that
when a person, corporation or individual is doing a lawful thing
in a lawful way, his conduct is not actionable, though it may
result in damage to another; for, though the damage done is
undoubted, no legal right of another is invaded, and hence it is
said to be *damnum absque injuria. Thomason v. Railroad,* 142
N. C., 318; *Dewey v. Railroad,* 142 N. C., 392."

And in *Biscoe v. Lighting Co.,* 148 N. C., 404, *Connor, J.,*
delivering the opinion, said: "In such cases the maxim, *Sic
utere tuo ut alienum non laedas,* is in no sense infringed. In its
just sense it means 'So use your own property as not to injure the
*rights* of another.' When no right has been invaded, although
one may have injured another, no liability has been incurred."

And in the case of *Richardson v. Railroad,* 126 N. C., p. 100,
it was expressly held that "Malice, disconnected with the in-
fringement of a legal right, is not actionable."

In the presence of this vast array of adverse authority, forti-
fied and upheld by the opinions of judges eminent for their wis-
·dom, learning and piety, the statement that a contrary view is
in accord with both good law and good morals would seem to be
somewhat self-sufficing. Nor is the reference in the principal
opinion to the moral aspects of the question any more illumin-
ating. We are all, I trust, striving, at times somewhat blindly,
to attain to the perfect righteousness of the great Teacher as well
as Saviour of men; but in the present stage of our development,
and with our limited human ken, it has been found best to con-
fine litigation in our civil courts to the enforcement of rights
and the redress of wrongs growing out of an invasion of those
rights, done or threatened, and not allow causes of action to be
based upon motive alone. For here we enter upon the domain
of taste and temperament, involving questions entirely too com-
plex, varied and at times fanciful for satisfactory inquiry and
determination by municipal courts. In a case so near the border
line as to divide this Court on a fundamental question as to
rights of property it is well to recur to the facts.

The plaintiff, a chief of police and owner of a house and lot,
on complaint made, has caused the defendant to remove his stable
from an adjoining piece of property. The defendant, smarting
under a sense of defeat, makes some hasty and ill-considered
expressions, erects a fence on his own land and in the protection
of his own property. He is now brought into court on the charge
that the fence has been constructed from malicious motives; that
it is too high, the planks are rough and undressed, and the house

of plaintiff, presumably one room of it, has been rendered so dark that he cannot see how to shave. If plaintiff can succeed in this, the next grievance will very likely be found in the shape of the roof or the color of the paint; and the defendant, who had supposed that he was the owner of a piece of property, no doubt descended to him from his fathers, will find that in the evolution of things modern he is only an occupant, holding subject to the capricious whims of some supersensitive and overly æsthetic but influential neighbor.

I am of opinion that no cause of action has been stated in the complaint or in the evidence, and that the judgment of nonsuit should be sustained.

MANNING, J., concurs in the dissenting opinion.