HORNSBY *v.* SMITH.

No. 13545.  January 16, 1941.

*Claud F. Brackett* and *A. J. Hall,* for plantiff in error.

*H. W. McLarty* and *Lewis H. Fowler,* contra.

Duckworth, Justice. ] If the alleged conduct of the defendant constitutes a continuing nuisance as defined in the Code, §

72-101, the plaintiff is entitled to equitable relief. Code, § 55-101; *Russell* v. *Napier,* 80 *Ga.* 77 (4 S. E. 857); *Spencer* v. *Tumlin,* 155 *Ga.* 341 (116 S. E. 600); *Phinizy* v. *Gardner,* 159 *Ga.* 136 (125 S. E. 195); *Rosser* v. *Styron,* 171 *Ga.* 238 (155 S. E. 23); 2 C. J. S. 46, § 52 (b). But, in reaching a solution of the main question, we encounter the following questions: (a) whether the defendant's right to make use of her land is qualified or absolute, (b) whether the petitioner has any right to the free passage of light and air laterally over defendant's land onto her own, and (c) whether the defendant's motive affects her right to the use of her own property; all of which questions will be dealt with in deciding the main question involved. This court has not heretofore ruled upon the exact question made by this record. Courts of other jurisdictions are divided. One line of decisions sustains the proposition that the owner of land has a right to erect thereon any structure, fence or otherwise, that in itself is lawful, and that the motive in erecting such structure is not open to inquiry. They sustain the right of such owner to maintain such structures, although his sole motive is malevolent and such structures are intended to injure his neighbor or the adjoining landowner. Supporting this view is 12 Am. & Eng. Enc. of Law (2d ed.), 1058, where it is declared: "According to the received view of the common law, the erection of a fence upon one's own land is not an actionable injury to one's neighbor, although the erection may deprive him of light and air, and may be dictated by motives of ill will." Supporting this statement of the rule and restating the substance in different language is 1 Am. Jur. 535, §§ 51, 52, and 22 Am. Jur. 546, § 43. In Letts *v.* Kessler, 54 Ohio St. 73 (42 N. E. 765, 40 L. R. A. 177), taking this view, the Ohio court supports its opinion with very forceful and persuasive arguments. It begins with the premise that the owner of land has the undeniable right to cut off the passage of light and air laterally over his own land by the erection of a building for a profitable use, and concludes that this right authorizes the erection of a fence that would have the same result, although the builder acted with deliberate intent to injure his neighbor and the fence was of no value to him. The opinion lays down the proposition that to allow the right to maintain an action against the builder of the fence to turn on the question whether or not the

fence is profitable to the builder or is erected because of malice toward the adjoining owner would not be to protect a legal right, but would constitute an attempt to control moral conduct. Another decision supporting this view is Metzger v. Hochrein, 107 Wis. 267 (83 N. W. 308, 50 L. R. A. 305, 81 Am. St. R. 841), where it is said that where the rules of the common law have not been changed by legislation, and the courts have kept strictly within their legitimate sphere as administrators of the law, the general rule is that whatever a man may lawfully do on his own property under any circumstances he may do regardless of the motive for his conduct. To the same effect, see Koblegard v. Hale, 60 W. Va. 37 (53 S. E. 793, 116 Am. St. R. 868, 9 Ann. Cas. 732), and numerous cases cited in the notes to 50 L. R. A. 305.

On the other hand, the opposite view is supported by numerous decisions of other jurisdictions. This side of the question is well stated and forcefully argued in Bush v. Mockett, 95 Neb. 552 (145 N. W. 1001, 52 L. R. A. (N. S.) 736). The fence there involved was about six feet high from the front sidewalk for a distance of fifteen feet back, and for the rest of its extent it was seven feet high. It was alleged that the fence shut out the light and view from the premises of the complaining party. The opinion conceded that the common law of England strenuously adhered to the doctrine that the owner of real estate might use it as he pleased, without regard to the convenience or interest of his neighbors, and that the earlier decisions of this country are inclined to the English view; but it was said that "in recent years there have been some very notable departures from the strict rule of those courts." The opinion cited with approval Barger v. Barringer, 151 N. C. 433 (66 S. E. 439, 25 L. R. A. (N. S.) 831, 19 Ann. Cas. 472), and quoted from that opinion as follows: "No one ought to have the legal right to make a malicious use of his property for no benefit to himself, but merely to injure his fellowman. To hold otherwise makes the law an engine of oppression with which to destroy the peace and comfort of a neighbor, as well as to damage his property for no useful purpose, but solely to gratify a wicked and debasing passion." In discussing the duty and power of a court of equity to grant relief in such case, it was said: "Courts of equity would fail in the service that history shows they were intended to render to society if they are unable to protect those common rights which more

clearly appear, and become more valuable, as civilization advances, and the relations of social life become more intricate and more enjoyable. As was said by Mr. Justice Hoke in his dissenting opinion in Barger *v.* Barringer, supra, we can not 'allow causes of action to be based upon motive alone. For here we enter upon the domain of taste and temperament, involving questions entirely too complex, varied, and at times fanciful for satisfactory inquiry and determination by municipal courts.' But when it appears that not only was the motive wholly malicious, but the intention and result were to seriously injure another, without benefit to anyone, courts of equity are not so impotent in these modern times that they are unable to prevent such a wrong."

Another decision supporting this view is Hibbard *v.* Halliday, 58 Okla. 244 (158 Pac. 1158, L. R. A. 1916F, 903). There the court conceded that at common law no actionable wrong can arise, unless there has been an invasion of another's right; and the owner of land has the right to make any reasonable use of his property without liability for any loss that may result to his neighbor from such use, and that a lawful act can not be actionable though it proceeded from a malicious motive. Then the opinion stated: "We can nowhere find it stated broadly as a principle of the common law that a landowner's property right in real estate includes the right to use it malevolently solely for the injury and annoyance of his neighbor without intending to subserve any useful purpose of his own. Therefore, when we concede that the owner of land has a right to make any reasonable use of his property and when employed for such use, may rightfully injure another, it does not follow that by its use for a wholly wrongful purpose he may also rightfully injure another. . . As was said by Mr. Justice Doe in the case of Thompson *v.* Androscoggin River Imp. Co., 54 N. H. 545, 551: 'Property in land must be considered, for many purposes, not as an absolute, unrestricted dominion, but as an aggregation of qualified privileges, the limits of which are prescribed by the equality of rights, and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors.'" Supporting the same view, see Burke *v.* Smith, 69 Mich. 380 (37 N. W. 838 , 8 L. R. A. 184); Flaherty *v.* Moran, 81 Mich. 52 (45 N. W. 381, 8 L. R. A. 183, 21 Am. St. R. 510); Kirkwood *v.* Finegan, 95 Mich. 543 (55 N. W. 457);

Peek *v.* Roe, 110 Mich. 52 (67 N. W. 1080) ; Norton *v.* Randolph, 176 Ala. 381 (58 So. 283, 40 L. R. A. (N. S.) 129, Ann. Cas. 1915A, 714), annotations in 27 L. R. A. (N. S.) 831, and 52 L. R. A. (N. S.) 736. In Burke *v.* Smith, supra, the Michigan court, in dealing with the question whether the court, in the absence of legislation, had the right to grant relief in such case, said: "That courts have failed to apply the remedy has ever been felt a reproach to the administration of the law; and the fact that the people have regarded this neglect of duty on the part of the courts so gross as to make that duty imperative by statutory law furnishes no evidence of the creation of a new right or the giving of a new remedy, but is a severe criticism upon the courts for an omission of duty already existing, and now imposed by statute upon them, which is only confirmatory of the common law." It would seem that the authorities accepting this view of the question are supported by the old maxim of the common law, "Sic uterè tuo ut alienum non lædas," which freely translated means, enjoy your own property in such manner as not to injure that of another person.

Because of the absence of a previous ruling by this court on the question involved, we have presented both sides by quoting freely from the decisions of other jurisdictions. This has been done for the purpose of obtaining illumination from both directions, and to give consideration to all the arguments presented in support of both views. From the authorities cited it must be conceded that under the common law of England the defendant would be permitted to erect the fence in question, although her action be dictated solely by malevolent motive, and the question of her motive would not be open to inquiry. By an act of the General Assembly approved February 25, 1784 (Cobb's Dig. 721), the common law of England was made the law of this State. The caption of that act recited that many salutary laws had been lost or destroyed, among which was an act reviving and putting in force such and so much of the laws of the province of Georgia as were adjudged necessary to be in force in this State, and stated that most of such laws were suitable to the circumstances of the people, and that it was absolutely necessary for the well-governing of the State that laws properly adaptable to the circumstances of the inhabitants be at all times in force. Section 1 of that act made all laws that were of force in the State on May 14, 1776, including the common

law, so far as they were not contrary to the constitution, laws, and form of government now established in the State, of full force and effect upon the passage of that act. In 1876, in *Turner* v. *Thompson*, 58 *Ga.* 268 (24 Am. R. 497), this court, after recognizing that at common law the right to an easement of light and air passing over another's land through ancient windows may be acquired by use for twenty years, observed that most of the American courts had repudiated this common-law rule as being wholly inapplicable, because it was not suited to a young and growing country. Thus the Georgia case mentioned is authority for holding that common-law rules unsuited to the conditions in this State are not of force here and were not made so by the act of 1784. And we think the common-law rule on this subject is not the law of this State.

We believe the major obstacle in the way of reaching a correct conclusion is the lack of understanding of the meaning of the words "lawful use" wherever employed in describing the rights of the owner of property. No court could correctly hold that the law would prevent an individual from doing the identical thing that the law authorizes him to do. What is lawful under one state of circumstances may be unlawful under a different state of circumstances. This rule is illustrated by an English decision rendered nearly a century and a half ago in Keeble *v.* Hickeringill, 11 East, 574, 103 Eng. Rep. 1127, where the plaintiff had at his own cost prepared and procured decoy ducks, nets, machines, and other engines for the decoying and taking of wildfowl, and enjoyed the benefit in taking them. The defendant, knowing this and intending to damnify the plaintiff and to frighten and drive away the wildfowl, discharged guns and drove the wildfowl away. A verdict in favor of the plaintiff was rendered, and on appeal it was held: "An action on the case lies for discharging guns near the decoy pond of another, with design to damnify the owner by frightening away the wildfowl resorting thereto, by which the wildfowl were frightened away and the owner damnified." Had the defendant discharged the guns on his own land in self-defense or for his own benefit, the acts would have been lawful, but discharging them under the circumstances alleged by plaintiff rendered it unlawful. The same principle was applied by the decision in American Bank & Trust Co. *v.* Federal Reserve Bank, 256 U. S. 350 (41 Sup. Ct. 499, 65 L. ed. 983, 25 A. L. R. 971). In that case several country

banks of Georgia sought relief in equity against the defendants, alleging, that the plaintiffs realized considerable income from charges on payment of checks drawn by their depositors when sent in through other banks from a distance; that the defendants were forbidden to make such charges, and that for the purpose of compelling the plaintiffs to become members of the Federal Reserve System or to open clearing accounts with them, the defendants intended to accumulate such checks in large amounts and then require cash payment by presentation over the counter, so as to compel the plaintiffs to maintain so much cash in their vault that they must either give up business or submit to the defendant's scheme. The Supreme Court held that the action was maintainable. In the opinion it was said:

"We lay on one side as not necessary to our decision the question of the defendants' powers, and assuming that they act within them consider only whether the use that according to the bill they intend to make of them will infringe the plaintiffs' rights. The defendants say that the holder of a check has a right to present it to the bank upon which it was drawn for payment over the counter, and that however many checks he may hold he has the same right as to all of them and may present them all at once, whatever his motive or intent. They ask whether a mortgagee would be prevented from foreclosing because he acted from disinterested malevolence and not from a desire to get his money. But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified. A man has at least as absolute a right to give his own money as he has to demand money from a party that has made no promise to him; yet if he gives it to induce another to steal or murder the purpose of the act makes it a crime.

"A bank that receives deposits to be drawn upon by check of course authorizes its depositors to draw checks against their accounts and holders of such checks to present them for payment. When we think of the ordinary case the right of the holder is so unimpeded that it seems to us absolute. But looked at from either side it can not be so. . . If without a word of falsehood but acting from what we have called disinterested malevolence a man by persuasion should organize and carry into effect a run upon a

bank and ruin it, we can not doubt that an action would lie. A similar result even if less complete in its effect is to be expected from the course that the defendants are alleged to intend, and to determine whether they are authorized to follow that course it is not enough to refer to the general right of a holder of checks to present them but it is necessary to consider whether the collection of checks and presenting them in a body for the purpose of breaking down the plaintiffs' business as now conducted is justified by the ulterior purpose in view. . . We do not need aid from the debates upon the statute under which the Reserve Banks exist to assume that the United States did not intend by that statute to sanction this sort of warfare upon legitimate creations of the States." That court conceded that under some circumstances and as a general rule the holder of a check has a right to present it to the bank upon which it was drawn for payment, but it was held that the presentation of checks for payment by a bank upon which they were drawn under the circumstances there alleged, which was a malicious intention to injure petitioners, was unlawful and would be restrained by a court of equity. / Thus it is our opinion that malicious use of property resulting in injury to another is never a "lawful use," but is in every case unlawful. The right to the use of property is therefore a qualified rather than absolute right. When one acting solely from malevolent motives does injury to his neighbor, to call such conduct the exercise of an absolute legal right is a perversion of terms. We know of no statute or other rule of law in this State that confers upon an individual a right to maliciously injure another, regardless of what method may be employed to inflict such injury. On the other hand, every one is entitled to the protection of the law against invasions of his rights by others. The use of one's own property for the sole purpose of injuring another is not a right that a good citizen would desire nor one that a bad citizen should have. Hence we hold that the defendant below has no legal right to the use of her property for the purpose and in the manner alleged in the petition.

But a plaintiff does not allege a cause of action by showing a total absence of a legal defense. He must show a right in himself to the relief sought, and this can be done only by showing an invasion of some right of his. Therefore, in order to sustain the judgment overruling the demurrer, it must be found that the peti-

tion shows an invasion of the plaintiff's right, by the fence in question. The air and light no matter from which direction they come are God-given, and are essential to the life, comfort, and happiness of every one. Under the rules of law, they may be properly and justifiably interfered with to a limited extent in order to secure benefits to others; but any departure from this limitation upon such interference which would authorize an interference that benefited no one, and is done solely from malice, is an invasion of the right to light and air, and will authorize a court to grant relief. The right of the plaintiff in this case to the free passage of light and air is subject only to a superior right of the defendant to make use of her property in good faith for the purpose of increasing her joy of ownership; and until the defendant makes such lawful use the plaintiff is entitled to prevent by legal process an interference with her right to light and air done solely for the purpose of injuring her. Some courts have held that the relief here sought can be granted only by legislation, and that in the absence of such legislation the courts are without power to grant it. Usurpation of the functions of the legislature by the courts is never justified, and will not be tolerated. But this fundamental principle is not upheld by a refusal of the judiciary to discharge to the limit of its authority the functions imposed upon it by the constitution, upon the excuse that further legislation is necessary. Legislation can declare general principles, and it is the duty of the court to apply those principles to varying statements of fact. For legislation to cover fully and specifically every conceivable state of facts would require such voluminous enactments as would render their use impractical. The authority of a court of equity to grant relief against the conduct alleged in the petition can not be challenged, and the petition was not subject to demurrer. See *Strachan* v. *Burford,* 173 *Ga.* 821 (162 S. E. 120).

The question at this stage is, not what petitioner may be able to prove or what may be a reasonable interpretation of the defendant's act, but whether the petition shows a ground for relief if the allegations are upon the trial supported by evidence. We think that in such a case the evidence should be clear and convincing, before the plaintiff would be entitled to a verdict.

*Judgment affirmed. All the Justices concur.*