2008 VT 130

## Susan ALBERINO v. David BALCH

[969 A.2d 61]

No. 07-266

¶ 1. October 24, 2008. This is an appeal from the decision of the superior court granting injunctive relief to appellee David Balch, ordering appellant Susan Alberino to remove a fence she constructed between their properties. We affirm.

¶ 2. Alberino and Balch have been feuding for over a decade about, among other things, Alberino's dogs, which have at times barked loudly enough to bother Balch, and have trespassed on Balch's land. The record reveals an acrimonious history that includes allegations of harassment, trespass, timber trespass, defamation, and conversion. Several years ago, Alberino caused to be erected an orange plastic mesh snow fence about 500 feet long and five feet high between her property and that of Balch. The fence was generally on the parties' shared property line, which is closer to, and more visible from, Balch's house than Alberino's. Parts of the fence, in fact, encroached on Balch's property, and in places the fence was stapled to trees owned by Balch.

¶ 3. In 2001, after the snow fence was erected, Alberino filed a harassment complaint against Balch in small-claims court. Balch counterclaimed, alleging trespass and nuisance based in part on the presence of the fence. The case was then transferred to superior court, where it has remained until this appeal. The claims were adjudicated in a November 15, 2001 order mandating, in relevant part, that Alberino remove the plastic fence.

¶ 4. After Alberino removed the plastic fence, she hired a contractor to build a new wooden fence in virtually the same location, albeit this time entirely on her side of the boundary. The new fence, completed in 2002, is 488 feet long and consists of four-by-eight-foot sheets of unpainted plywood affixed to posts. The sheets of plywood are oriented vertically, so they are eight feet tall. The plywood has begun to delaminate, curl, warp, and buckle. The sheets are not flush with the ground, the fence does not enclose any area, and there is at least one hole in the fence where one of the plywood sheets has warped and detached from the post.

¶ 5. In March 2004, after Alberino moved to dismiss the underlying case, Balch filed a motion for contempt of the 2001 order that had required Alberino to remove the plastic fence. Among other things, Balch requested that Alberino be ordered to remove the plywood fence. The superior court conducted a hearing on the motion and made a site visit. Photographs of the fence were submitted into evidence, and are part of the record on appeal. At the hearing, Alberino testified that the fence was built primarily to protect her privacy, but also to prevent her dogs from going onto Balch's land, and to minimize noise. Balch also testified at the hearing, detailing the nature of the fence and its impact on his use and enjoyment of his property, and stating that the fence was more visible from his house than from Alberino's. Further, Balch testified that the fence has curled so much that it encroaches on his land, that it casts a shadow "halfway across [his] land," and that it "does not inhibit sound at all." Balch further testified that, after the plywood fence was built, the dogs "go where they want," including onto his property.

¶ 6. The court issued findings of fact and conclusions of law on August 24, 2005. The court found that the fence served "no objective purpose," either by containing the dogs, lessening the noise of their barking, or by effectively protecting Alberino's privacy. The court further found that "the fence is an ugly wall." Accordingly, citing 24 V.S.A. § 3817, the

court ordered that the plywood panels be removed. See 24 V.S.A. § 3817 ("A person shall not erect or maintain an unnecessary fence or other structure for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air.").

¶ 7. Our review of the court's decision to grant injunctive relief is for abuse of discretion. *In re Letourneau*, 168 Vt. 539, 551, 726 A.2d 31, 40 (1998). We review the court's findings in the light most favorable to Balch, disregarding modifying evidence. *In re M.B.*, 2004 VT 58, ¶ 6, 177 Vt. 481, 857 A.2d 772 (mem.). We will not set aside factual findings unless they are clearly erroneous. *Id.* Findings are clearly erroneous if there is no credible evidence in the record to support them. *Okemo Mountain, Inc. v. Lysobey*, 2005 VT 55, ¶ 8, 178 Vt. 608, 883 A.2d 757 (mem.). We will not reverse the trial court's decision if the record below reveals any legal grounds that would justify the result. *Larkin v. City of Burlington*, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.). Viewed through that deferential lens, the findings here amply support the trial court's decision to order the fence removed, and there is credible evidence in the record to support the findings.[1]

¶ 8. We first consider Alberino's general contention that the trial court improperly relied on its own observations during a

site visit. It appears from the record, however, that the trial court relied on the site visit only to assist in its evaluation of the testimony and other evidence. Such use of the site visit was entirely proper. As this Court has held in several contexts, the finder of fact may conduct a site visit or other analogous inspection, and may "base its findings upon such examination *together with all the evidence in the case.*" *Daigle v. Conley*, 121 Vt. 305, 309, 155 A.2d 744, 748 (1959) (emphasis added); see also *In re Quechee Lakes Corp.*, 154 Vt. 543, 551-52, 580 A.2d 957, 962 (1990) (administrative fact-finder may rely to same extent as trial judge on knowledge gained from a site visit); *Cass-Warner Corp. v. Brickman*, 126 Vt. 329, 336, 229 A.2d 309, 314 (1967) (affirming verdict based in part on court's view of allegedly defective bulkhead); *McAndrews v. Leonard*, 99 Vt. 512, 521, 134 A. 710, 714 (1926) (upholding jury verdict based in part on jury's inspection of tort plaintiff's allegedly injured skull, holding that "the jury had a right to base their verdict upon such examination together with all the evidence in the case"). The out-of-state cases Alberino cites in opposition are distinguishable on their facts, and Alberino offers no reason to depart from our own settled precedent in this area; indeed, Alberino has not cited any of our site-visit cases. We find no error in the court's apparently limited reliance on the site visit.

¶ 9. Alberino also contends that the trial court erred in finding that the fence served no useful purpose, and in ordering that the fence be removed without finding that its *sole* purpose was to annoy Balch. Alberino cites various out-of-state cases for the proposition. If the fence had *any* useful purpose, Alberino claims, the court was without power to order it removed. There are, however, also cases holding that a fence with a *primary* purpose to annoy is also subject to abatement. The cases are uniform in their approval of

---

[1] The dissent asserts that our opinion is based largely on aesthetics and that we have incautiously "entered into the domain of taste and temperament." *Post*, ¶ 15. Our dissenting colleague therefore invokes and reviews the old-country doctrine of ancient lights. But that doctrine's bearing on today's appeal is glancing at best, and it is a poor substitute for any mention of Balch's testimony below, the acrimonious history between the parties, the relevant procedural history in this case, or our deferential standard of review.

reliance on the history of relations between neighbors as evidence of intent to annoy. See, e.g., *Gertz v. Estes*, 879 N.E.2d 617, 621 (Ind. Ct. App. 2008) ("The parties' conduct and the extraordinary nature of the fence were adequate to overcome [the] assertion that the eight-foot fence was intended to protect eighteen-inch tree seedlings."). We need not decide which standard is required generally; the factual backdrop here — the photographs of the fence, the site visit, the contempt order concerning the other fence in virtually the same location, and over fifteen years of increasingly acrid disputes about dogs, brush piles, trespass, plowing, and noise — supports a finding that the fence was intended solely to annoy Balch by obstructing his view and shading his property. Thus which standard is employed is immaterial to the outcome of this appeal.

¶ 10. Alberino, however, contends that no such finding was made in any event. While Alberino is correct that the court did not explicitly find that her purpose was either solely or primarily to annoy Balch, the only plausible reading of the trial court's order is that such a finding was implicit. See *Gamache v. Smurro*, 2006 VT 67, ¶ 18, 180 Vt. 113, 904 A.2d 91 (affirming family court's decision on property distribution despite decision's reliance on implicit finding). Here, the contention that the plywood fence was a so-called "spite fence" was at all times explicitly linked to the contention that it served no legitimate purpose. The trial court did explicitly find that none of Alberino's claimed reasons for building the fence were credible, that the fence "serves no objective purpose," and that it is a "spite fence." These findings, coupled with the undisputed years-long feud between the parties, and the testimony of Balch, support the implied finding that the fence's sole purpose was to annoy Balch by interfering with his view.

¶ 11. The trial court's finding that the fence was not flush with the ground and thus was useless to prevent the dogs from crossing the property line is supported by the photographs adduced by defendant. Those photographs plainly show gaps in the lower part of the fence, resulting from warping panels and from Alberino's failure to align the bottoms of the panels with the varied terrain.[2] Balch also testified that the irregular plywood boards were warping and "cupping" as much as two feet in places, which supports the finding that there were holes in the fence capable of admitting a small dog. Alberino's evidence that the bottoms of some panels were "contoured" with a chainsaw is modifying evidence, which we disregard in evaluating the decision to grant injunctive relief. *In re M.B.*, 2004 VT 58, ¶ 6. We note also that it is undisputed that the fence does not actually prevent dogs from crossing the property line.

¶ 12. Alberino does not take issue on this appeal with the court's finding that the fence was not intended to, and did not in fact, lessen the noise allegedly emanating from Balch's property. We therefore turn to Alberino's contention that the

_____

[2] Alberino contends that "absolutely no evidence was offered at trial . . . that any openings whatsoever were left at the bottom of the fence through which dogs could crawl." Two of the photographs introduced into evidence refute this characterization of the record. One shows a panel, nearly the entire bottom half of which is tremendously warped, leaving an opening that would clearly admit passage of even a large dog. The second shows a hilly section of the property and a section of fence comprising five panels, each of which has a straight bottom edge, and each of which therefore leaves a triangular hole roughly one foot high at the bottom of the fence. These photographs alone would support the finding; considered together with the court's site visit, there is ample support for the finding.

court erred in finding that the fence served no privacy purpose. The court found that the woods between the fence and Alberino's house were so extensive as to render the fence superfluous for the stated privacy purpose.

¶ 13. In large measure, that finding amounted to a credibility determination; Balch testified that the fence was never meant to, and could not, ensure Alberino's privacy, while Alberino testified that the fence was primarily intended to discourage or prevent Balch from spying on her and her family. *Gertz v. Estes*, an Indiana case, is closely on point. Indiana has a spite-fence statute similar to Vermont's. See Ind. Code § 32-26-10-1 & -2. After two or more years of deteriorating relations, the Gertzes constructed a fence much like Alberino's (eight feet high, impervious to light and air, quite costly, and directly on the property line). Like Alberino's fence, the Gertz fence "did not enclose any area" and therefore was "useless for livestock" or to contain the cats about which the Gertz's neighbors had previously complained. *Gertz*, 879 N.E.2d at 621. The appellate court held that "[t]he parties' conduct and the extraordinary nature of the fence were adequate to overcome [Gertz's] assertion that the eight-foot fence was intended to protect . . . tree seedlings." *Id.* Similarly, here, the trial court apparently did not credit Alberino's testimony concerning privacy. The evaluation of witness credibility is, of course, the province of the factfinder. See *Cabot v. Cabot*, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997).

¶ 14. A Connecticut case cited by the trial court, *DeCecco v. Beach*, 381 A.2d 543 (Conn. 1977), is also instructive. In that case, the plaintiff-landowner sought an injunction mandating that his neighbor remove four sections of a ten-foot-high wooden fence that blocked the plaintiff's view of a river. After concluding that there was support in the record for the trial court's conclusion that "malice was

the primary motive in [the fence's] erection," the court noted that "the fact that it also served to protect the defendant's premises from observation must be regarded as only incidental, since to hold otherwise would be to nullify the [spitefence] statutes." *Id.* at 545. So it is here. The court heard testimony and viewed photographs of the area between the parties' houses and conducted a site visit before finding that the woods between them were "extensive" and protected Alberino's privacy to an extent that rendered the fence superfluous for that purpose. There was credible evidence in the record, in the form of photographs and testimony, to support the court's finding, and we will not disturb it on appeal.

*Affirmed.*

¶ 15. **Skoglund, J.,** dissenting. It is not that I doubt my colleagues' aesthetic sensibilities, but rather their understanding of spite-fence laws, and their origin and purpose. By affirming the trial court, the majority has entered into the domain of taste and temperament, a treacherous land fraught with disagreement. The trial court based its decision largely on aesthetics, while disregarding express statutory requirements governing spite fences. Its findings do not support an application of Vermont's unnecessary fence statute, 24 V.S.A. § 3817, or a conclusion that Alberino's fence is a private nuisance. While the majority acknowledges the paucity of the trial court's findings, it nonetheless affirms, making the necessary findings itself for the first time on appeal. I would reverse the trial court's decision. See *Cooley Corp. v. Champlain Valley Union High Sch.*, 144 Vt. 341, 343, 477 A.2d 624, 626 (1984) (explaining that the trial court, not the Supreme Court, must find facts essential to the case, and reversing where the trial court failed to do so). An ugly fence is not necessarily an unlawful one. I dissent.

¶ 16. The trial court did not conclude that Alberino erected her fence to annoy

Balch in violation of 24 V.S.A. § 3817, nor did it find that the fence obstructed Balch's view or deprived him of light or air as required by § 3817. Instead, the court found only that the fence was an "ugly wall," easily viewed from Balch's yard when Balch mowed his lawn, but barely visible from Alberino's house or yard. It found that the fence served no objective purpose — it did not keep noise out, it would not keep small dogs in. Even more troubling to this writer, the trial court decided, notwithstanding Alberino's stated intention to protect her privacy by fencing her property, that the fence did not meet that purpose. The court then defined a spite fence using case law from other jurisdictions, but it did not conclude that Alberino's fence fit its definition. It similarly cited, but did not apply, Vermont's unnecessary fence statute. The court concluded only that Alberino's failure to paint her fence suggested her indifference to the negative visual effect of the fence on Balch. Section 3817 does not require Alberino to consider the aesthetic impact of her fence on Balch, however, and the court's conclusion does not provide a sufficient basis for its order compelling Alberino to remove her fence.

¶ 17. To place Vermont's unnecessary fence statute in context, I begin with a brief discussion of a property owner's rights at common law to light, air, and views. Under the English doctrine of ancient lights, a landowner could acquire an implied prescriptive easement in the light coming across his neighbor's property, and he could enjoin his neighbor from interfering with his continued access to such light. See 4 R. Powell, Powell on Real Property § 34.11[5], at 34-124 (2008). This doctrine was viewed as incompatible with conditions in the rapidly developing United States, and in 1860, this Court, like other courts around the country, repudiated it. See *Hubbard v. Town*, 33 Vt. 295, 300 (1860); see also 4 R. Powell, Powell on Real Property § 34.11[5], at 34-125 (doctrine of ancient lights has been disavowed repeatedly by American courts); 9 R. Powell, Powell on Real Property § 68.10, at 68-47[1] ("The overwhelming consensus is that in absence of a statute or negative easement or covenant, neighboring land possessors have no rights to view, air or light over another's land."). Courts feared that recognizing such implied rights would unfairly prevent landowners from developing their own property if, in so doing, it would affect the flow of air or the delivery of light. See *Wilson v. Handley*, 119 Cal. Rptr. 2d 263, 267 (Ct. App. 2002) (explaining that doctrine of ancient lights was ill-suited to conditions in United States during period of rapid growth, and noting that society had significant interest in encouraging unrestricted land development, while access to light, in contrast, had little social importance beyond its value for aesthetic enjoyment or illumination).

¶ 18. Thus, in *Hubbard*, this Court rejected landowner Hubbard's claim that he was entitled to damages when his neighbor, the defendant, constructed a building on his own land next to Hubbard's building, thereby cutting off the light to two of Hubbard's windows. 33 Vt. at 300. Because the landowner had interfered with no right of the defendant when he constructed his own building, the Court explained, he had nothing upon which to base a claim that he had acquired a right from defendant to continued use of the light. *Id.* at 298-99. As the Court explained:

> If a man can acquire, by use, a right to an uninterrupted enjoyment of light under circumstances like the present, why not acquire a right to a like enjoyment of the prospect from the same windows, or to a free access of the air to the outside of his building to prevent decay, and

many other rights of a similar and no more ethereal character? The result of which would be, if allowed, an utter destruction of the value of the adjoining land for building purposes.

*Id.* at 299-300. To adopt such a rule, the Court continued, "would be to recognize a principle at variance with well established rules, and one that could not be tolerated in this country." *Id.* at 300. And, the Court noted, it would require landowners to build useless structures on their own property simply to block their neighbor's light and prevent their neighbors from acquiring an implied right to continued access to light. *Id.* at 302. This "would lead to continual strife and bitterness of feeling between neighbors, and result in great mischief." *Id.*

¶ 19. Thus, prior to 1886 when Vermont's unnecessary fence statute was enacted, it appears that each property owner's right to develop his own property was "virtually unlimited"; he was thought to own his property "to the center of the earth and up to the heavens." *Wilson,* 119 Cal. Rptr. 2d at 267 (quotation omitted). He could "build a fence on his own land as high as he please[d], however much it [might] obstruct his neighbor's light and air." *Rideout v. Knox,* 19 N.E. 390, 391 (Mass. 1889). For example, in the 1870's, when Charles Crocker sought to purchase an entire city block on San Francisco's Nob Hill on which to build a mansion, and a local undertaker named Yung would not sell his small lot to Crocker, Crocker bought the remainder of the block and built a fence forty feet high on his property around Yung's lot. Eventually, Yung sold his lot and Crocker procured the entire block. See *Wilson,* 119 Cal. Rptr. 2d at 268.

¶ 20. The question of whether a landowner also possessed the common-law right to use his property solely to spite his neighbor was unsettled, however, and

subject to substantial divergence of opinion in state courts. Resolution of the question has depended largely on a state's position "on the basic policy question of whether a person's motive should affect his right to use his own property." 9 R. Powell, Powell on Real Property § 62.05, at 62-45. Compare *Sundowner, Inc. v. King,* 509 P.2d 785, 786 (Idaho 1973) (stating that "[u]nder the so-called English rule, followed by most [nineteenth] century American courts, the erection and maintenance of a spite fence was not an actionable wrong," and that "[t]hese older cases were founded on the premise that a property owner has an absolute right to use his property in any manner he desires"), with *Barger v. Barringer,* 66 S.E. 439, 439 (N.C. 1909) (recognizing view that under English common law "the erection of a fence upon one's own land [was] not an actionable injury to one's neighbor, although [the neighbor] may be deprived of light and air thereby, and the act may be dictated by motives of ill will," but also recognizing decisions holding that this principle of common law "should not be held to authorize the creation and maintenance of a nuisance for the sole purpose of gratifying a most ignoble passion").

¶ 21. Nonetheless, beginning in the late 1800s, Vermont, like several other states, enacted laws to expressly prohibit landowners from building fences or fence-like structures to spite their neighbors. Many of these laws, like Vermont's, included references to the obstruction of light, air, or views. See, e.g., 1894 V.S. § 4697 ("No person shall erect or maintain an unnecessary fence or other structure, more than six feet in height, for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air . . . ."); N.Y. Real Prop. Law § 843 (McKinney 2008) (allowing action for removal of fence or fence-like structure greater than ten feet high that excludes owner or occupant of struc-

ture on adjoining land "from the enjoyment of light or air"); see also *Lord v. Langdon*, 39 A. 552, 552 (Me. 1898) (upholding verdict against landowner for violation of 1893 law that deemed as a private nuisance "any fence or other structure in the nature of a fence, unnecessarily exceeding eight feet in height, maliciously kept and maintained for the purpose of annoying the owners or occupants of adjoining property"); *Rideout*, 19 N.E. at 392 (upholding constitutionality of 1887 Massachusetts law that prohibited unnecessary boundary fences or fence-like structures that unnecessarily exceeded six feet in height that were "maliciously erected, or maintained for the purpose of annoying adjoining owners or occupiers"); *Horan v. Byrnes*, 54 A. 945, 949 (N.H. 1903) (upholding constitutionality of New Hampshire law, which declared that any fence, or other structure in the nature of a fence, exceeding five feet in height, erected for the purpose of annoying an adjoining owner, shall be deemed a private nuisance).

¶ 22. Even in the absence of specific legislation, courts began to hold as early as 1888 that spite structures could be considered private nuisances. Thus, in *Burke v. Smith*, 37 N.W. 838, 842 (Mich. 1888), the court concluded that even in the absence of a spite-fence statute, a landowner had no right to erect screens directly in front of his neighbor's windows solely out of malice, and thereby shut out all light and air from these windows. In reaching its conclusion, the court rejected the assertions that a landowner had the legal right to use his property as he desired, and that his motivation in doing so was irrelevant. The court reasoned that no one had "a right to build and maintain an entirely useless structure for the sole purpose of injuring his neighbor," and that the common law did not permit "a man to be deprived of water, air, or light for the mere gratification of malice." *Id.* at 839-40.

¶ 23. Many other courts similarly view spite structures as an unreasonable use of one's property, and thus, a private nuisance. See, e.g., *Welsh v. Todd*, 133 S.E.2d 171, 173 (N.C. 1963) (reciting rule that spite fence considered a private nuisance under North Carolina law). As Powell explains, "[w]here the defendant's conduct is motivated solely by malice, the use is deemed unreasonable because the conduct has no utility recognizable at law." 9 R. Powell, Powell on Real Property § 64.03[4], at 64-19. This Court has similarly recognized that "the great majority of jurisdictions have held that where a defendant has acted solely out of malice or spite, such conduct is indefensible on social utility grounds, and nuisance liability attaches." *Coty v. Ramsey Assocs.*, 149 Vt. 451, 458, 546 A.2d 196, 201 (1988). Thus, while the earliest cases date to the nineteenth century, the judicial recognition of a cause of action for the removal of a spite structure — whether through a specific statute or private nuisance law, or a combination of both — represents the modern trend. See 9 R. Powell, Powell on Real Property § 62.05, at 62-47 (stating that the modern trend "favor[s] the view that a spite fence that serves no useful or beneficial purpose is unlawful," and that an aggrieved party may file an action for damages and abatement); *King*, 509 P.2d at 786 ("Under the modern American rule, . . . one may not erect a structure for the sole purpose of annoying his neighbor."). However, when liability is premised on the basis of a statute, as in the case at bar, the language of the statute necessarily controls.

¶ 24. With this background in mind, we turn to Vermont's unnecessary fence statute, which has remained largely unchanged since 1886. The law prohibits individuals from erecting or maintaining a fence or other structure "for the purpose of annoying the owners of adjoining property by obstructing their view or depriv-

ing them of light or air."[3] 24 V.S.A. § 3817. As noted above, the trial court in this case did not find that Alberino's fence was erected to annoy Balch by obstructing his view, or depriving him of light or air, nor can these findings be fairly implied from the court's decision. Indeed, it does not appear that the court even considered the specific requirements set forth in § 3817. And, based on the survey maps introduced at trial, it would have been impossible to find that the fence deprived Balch of light or air since the fence is approximately one hundred and fifty feet from his house. Contrary to the majority's assertion, it does not necessarily follow that because Alberino's fence "served no objective purpose," she therefore erected the fence to annoy Balch by obstructing his light, air, or view.[4] Section 3817 does not require the removal of fences simply because they are unnecessary, nor does it compel the removal of a fence simply because it is an "ugly wall." The court's statement about Alberino's failure to paint the fence similarly does not demonstrate that the requirements of § 3817 are satisfied. The statute expressly limits "annoyance" to the obstruction of views or the deprivation of light or air. The court's decision, in contrast, appears to turn largely on aesthetics, and aesthetic considerations alone cannot justify ordering the removal of a fence under the plain terms of the statute.

_____
[3] As referenced above, the statute originally included a requirement that the fence or structure be more than six feet in height. It also empowered the town selectmen to remove such fences or structures at the owner's expense if the owner failed to do so after twenty-four hours notice. See 1894 V.S. § 4697.

[4] Based on this reasoning, the old refrigerator that Balch placed on his property to mark a boundary line would serve an objective purpose and could not be complained of as unsightly.

¶ 25. To the extent that the court relied on nuisance law in reaching its conclusion, its decision is similarly flawed. To be considered a nuisance, an individual's interference with the use and enjoyment of another's property must be both unreasonable and substantial. *Coty*, 149 Vt. at 457, 546 A.2d at 201. We recognized in *Coty* that, "[a]s a general rule, the unsightliness of a thing, without more, does not render it a nuisance under the law." *Id.* at 458, 546 A.2d at 201; see also *Wernke v. Halas*, 600 N.E.2d 117, 121-22 (Ind. Ct. App. 1992) ("[I]t is well-settled throughout this country that, standing alone, unsightliness, or lack of aesthetic virtue, does not constitute a private nuisance."). While we noted in *Coty* that "the interferences complained of in the so-called 'spite fence' cases are often limited to aesthetics," 149 Vt. at 458 n.1, 546 A.2d at 201 n.1, we did not hold that aesthetic interferences alone were sufficient to constitute a nuisance under Vermont law. See *id.* at 458, 546 A.2d at 201 (reasoning that the Court need not consider if unsightliness alone was sufficient to constitute nuisance because the case at issue involved more than mere unsightliness). Indeed, the spite-fence case cited in *Coty* as support for this proposition, *Welsh v. Todd*, did not turn on aesthetics — the fence at issue in that case was one commonly used as a windbreak and it consisted of small concrete posts and interwoven boards of western cedar. The *Welsh* court based its decision on whether the fence in question was of beneficial use to the owner and whether it had been erected and maintained solely for the purpose of annoying the owner's neighbor. 133 S.E.2d at 173. This appears to be true of most, if not all, spite-fence cases — spite fences are not unlawful as a nuisance because they are unattractive; they are unlawful, no matter how attractive, if they interfere with the enjoyment of property.

¶ 26. Courts are ill-equipped to judge the aesthetic impact of boundary fences

or other structures erected on private property. An Indiana Court of Appeals reached a similar conclusion in *Wernke.* In that case, a landowner erected a ten foot pole on his property, topped with a piece of blue plywood, to which he attached a toilet seat with a painted brown spot and a toilet lid. The landowner contended that this structure, which faced his neighbor's yard, was a bird house. His neighbor claimed it was a nuisance, but the court disagreed. "It may be the ugliest bird house in Indiana," the court stated, "or it may merely be a toilet seat on a post," but the court found the distinction irrelevant because the neighbor's "tasteless decoration is merely an aesthetic annoyance, and we are not engaged in the incommodious task of judging aesthetics." *Wernke,* 600 N.E.2d at 122. The court recognized that "[a]esthetic values are inherently subjective," and reasoned that "if landowners in a given neighborhood or development wish to contract among themselves for the appearance of their homes, the courts stand ready, within well-settled limits, to provide enforcement." *Id.* But "[i]t would require a great leap of logic," the court continued,

> to say that courts themselves should be the arbiters of proper aesthetics and good taste, and it is a leap we are unwilling to make. . . . In our populous society, the courts cannot be available to enjoin an activity solely because it causes some aesthetic discomfort or annoyance. Given our myriad and disparate tastes, life styles, mores, and attitudes, the availability of a judicial remedy for such complaints would cause inexorable confusion.

*Id.* (quotation omitted). The same holds true in this case. The fact that Alberino erected an unpainted board fence that the trial court found to be "ugly" does not suffice to show that the fence itself is a nuisance. Nor does it satisfy the definition of an unnecessary fence found in our statute. There was no finding that it obstructed Balch's view or deprived him of light or air.

¶ 27. Unless we want the courts to become the arbiter of proper aesthetics and good taste, the limited purpose behind the unnecessary fence law must be observed and followed. And, notwithstanding the animosity demonstrated by the combatants below, it is not for the court to determine the validity of a landowner's desire for privacy. The trial court's decision here is unsupported by its findings and it is unsupported by the law. Its decision should therefore be reversed.

Motion for reargument denied December 30, 2008.