Obolensky et. al. v. Trombley et. al., No. 860-12-07 Rdcv (Teachout, J., Sept. 26, 2013).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                     **CIVIL DIVISION**
**Rutland Unit**                                       **Docket No. 860-12-07 Rdcv**


**MICHAEL OBOLENSKY and
JIRINA OBOLENSKY**


    **v.**


**ROBERT TROMBLEY and
SANDRA TROMBLEY**


### DECISION
**Post Judgment Motions for Enforcement and Contempt, and
Plaintiffs' New Claim under Amended Complaint**

The parties are adjoining landowners who had a dispute concerning the location of their common boundaries and related mutual claims of trespass. They resolved the dispute by stipulation that became a Judgment and Order in this case on June 30, 2011. Immediately after the filing of the stipulation with the Court, disputes developed concerning compliance with its terms. This Decision encompasses both post judgment motions filed in 2011 and a new claim allowed in an amended complaint filed in 2012 as described below.

Post Judgment Motions: Now before the Court are Defendants' Motion to Enforce filed August 5, 2011, Plaintiffs' Motion for Contempt filed September 8, 2011, and Plaintiffs' Motion for Contempt filed August 3, 2012.[1] The Court viewed the properties on November 21, 2011 at the start of the evidentiary hearing on the motions, and the hearing continued on January 23, June 11, and August 20, 2012. Plaintiffs are represented by Attorney Thomas Nuovo, who was joined by Attorney Kevin Volz at the hearing on August 20, 2012. Defendants were represented by Attorney Ralph Foote on the post judgment motions.

Defendants seek enforcement of the stipulated Order as follows: they seek a ruling that the fence that Plaintiffs erected after the Order was agreed to is an unlawful spite fence and therefore in violation of the Order, and they seek an injunction for its removal. Defendants also seek a finding of trespass on the grounds that a wire fence erected on a different common boundary encroaches on Defendants' land, and they seek an injunction for its removal. They also seek damages for trespass by Plaintiff Jirina Obolensky for entering their property. Finally, they seek a finding that Plaintiffs violated the Order when they retained the independent surveyor

---

[1] The Motion for Additional Contempt filed August 10, 2013 became the additional cause of action pursued in the Amended Complaint described in the next section.

who implemented the stipulation to do some supplementary work for Plaintiffs after his stipulation work, specifically placing additional boundary pins along a common boundary. Defendants seek costs and attorneys' fees.

Plaintiffs seek damages for trespasses they allege occurred after the parties' stipulation was signed, as well as a finding of contempt for violations they allege occurred after Defendants were served with the Order. Specifically, they seek damages for trespass for Defendants' cutting vegetation and depositing debris on Plaintiff's land to the north of Defendants' land, and for Defendants' cutting grass on Plaintiffs' side of the boundary line (between Plaintiffs' fence and the boundary line) to the east of Defendants' parcel. Plaintiffs seek an injunction against further trespasses, a finding of contempt, punitive damages, and costs and attorneys' fees.

Amended Complaint: Plaintiffs seek damages and punitive damages based on their allegation of conduct subsequent to the filing of the post judgment motions. Specifically they claim that the Defendants poisoned trees that Defendants planted on their own property after the stipulated Order, and they allege the conduct was first discovered in the summer of 2012 at the time the hearing on the post judgment motions was almost complete. By Order of August 22, 2012, they were allowed to file an amended complaint to add this new cause of action. The hearing on this claim took place on July 22 and 23, 2013, but all of the evidence previously taken in connection with the post judgment motions is also evidence for purposes of this claim. On July 22 and 23, 2013, Plaintiffs continued to be represented by Attorney Thomas Nuovo, and the Defendants represented themselves.

**Findings of Fact**

The parties' properties are adjacent to each other just outside of the town center of Brandon, Vermont in a rural setting near some majestic mountains. Plaintiffs Jirina and Michael Obolensky purchased their property in 1995. It includes an architecturally interesting and attractive large Victorian house sometimes called the "Birdcage." The house is located at the lower eastern end of their property, and does not have direct views of the nearby mountains, but the property includes 40 acres and if you walk uphill from the house, up the field to the highest part of the land, there is a beautiful view of the mountains. Plaintiffs live both at the Brandon property and in New York City, with Michael Obolensky living primarily in New York City and Jirina Obolensky living primarily at the Vermont property, which she has, in the past, operated as a high end bed and breakfast, serving guests connected with Middlebury College. They intend to use the property to host open air weddings in a pastoral setting, taking advantage of the hillside with the beautiful views and the open field.

Defendants Robert and Sandra Trombley purchased their property in 2004. At the time of purchase, it was an unimproved lot of 3.7 acres at the top of the rise referred to above, and it has a beautiful direct view of the mountains (the same view as that seen from the highest, western end of the Plaintiffs' land). They built a home on the property in 2006. It is a simple rectangular shaped home with windows that face the mountain view. The exterior wall is approximately 37 feet from the common boundary with Plaintiffs. Robert Trombley works in a position of responsibility for highway signs for the Vermont Department of Transportation. He takes pride in maintaining his property: the lawn is always mowed, and all vegetation is trimmed

2

in a clean and immaculate way. Sandra Trombley works as a human resources administrator for the National Bank of Middlebury, where she has worked for many years. When the Trombleys purchased their lot, their land and the Plaintiffs' land to the east was all open and was a grassy field. There was a dilapidated barbed wire fence between the properties that had not been maintained as an erect stable fence for quite some time. Neither their parcel nor the Plaintiffs' property had been surveyed.

Not long after the Trombleys built their house, the Obolenskys had some boundary survey work done by surveyor Ronald LaRose. A disagreement developed over the location of their common boundary. There were two common boundary lines at issue, as both the north and east boundaries of the Trombleys' parcel abut the Obolensky land. In the area on the Obolensky side of the Trombleys' north boundary, there was thick vegetation, including brush, saplings, and full-grown trees; the land on the Trombley side was open and groomed by Mr. Trombley. The boundary line on the east side of the Trombley property was on the hillside with the good view of the mountains, had the dilapidated fence on it, and is over 500 feet long. From the Trombley house, the Obolensky field started in the foreground about 37 feet away from the Trombley house and sloped down to the Birdcage house at the bottom of the field, which was (and is) located about 400-440 feet away from the boundary line.

Mrs. Obolensky put up No Trespassing signs in the fall of 2007 where she believed her boundary was, based on the LaRose survey. She placed the signs 8 feet inside the area mowed by and claimed by Mr. Trombley. Mr. Trombley went to speak to Mrs. Obolensky and she ignored him. The Brandon police were called and they advised that the matter would have to be addressed in court as a civil action. The Police Chief asked Mrs. Obolensky to leave and she refused. He took her by the arm and she was belligerent and pulled away. The Chief told Mr. Trombley to remove the No Trespassing signs, which he did, and he put them on the Obolensky property as directed by the Chief. From then on, there has been hostility between the parties, primarily instigated by Mrs. Obolensky, who continues to blame Mr. Trombley for removing her signs and also believes that the Brandon Police have refused to provide her with proper support. On Christmas Eve in 2007, the sheriff served the Trombleys with the summons and complaint to commence the underlying lawsuit in this case.

The Trombleys represented themselves in the suit for quite some time. They had survey work done by Timothy Short. Animosity continued, primarily from Mrs. Obolensky to Mr. Trombley. In the fall of 2009, there was an incident in which while the Trombleys were eating supper, Mrs. Obolensky and some guests walked up from the Birdcage to the Trombley property, carrying wine glasses. They walked on to the Trombley lawn mowed by Mr. Trombley. They walked up and down along the boundary line on the lawn mowed by and claimed by the Trombleys. A man in the group urinated on the lawn. Mrs. Obolensky turned her back toward the Trombleys and exposed her backside. The incident resulted in a criminal charge against Mrs. Trombley. She successfully completed the Diversion program, resulting in dismissal of the charge.

In March of 2011, as a result of mediation, the parties reached an agreement to resolve the civil case. A written stipulation was prepared for the parties to sign. It called for the establishment of an agreed-upon boundary line based on the Short survey, and further called for

3

the hiring of an independent surveyor to mark the boundary corners. It also provided that each side was permitted to erect a fence between the parcels as allowed by law.[2] No particular specifications were established for either the location of the fence or its characteristics. In correspondence between the attorneys, it was clear that the Obolenskys intended to put up a fence. There was discussion about whether it would be a boundary fence in which the Trombleys would have some legal interest and obligation under 24 V.S.A. § 3402, or a fence entirely on the Obolensky property.

On June 17, 2011, the parties signed the final stipulation, which was later issued as an Order of the Court, resolving the whole case on June 30, 2011. Pursuant to the agreement, a Mr. Hopkins was hired at some point as the independent surveyor to mark the corners.

At 5:30 a.m. on June 18, 2011, the morning after the stipulation was signed, the Trombleys awoke to the sound of weedwhacking, and discovered an employee of a fence company cutting down the grass in a swath along their eastern boundary line. Two days later materials were delivered for the erection of a fence.

On June 20, 2011, the Obolenskys erected a stockade fence 6 feet 1 inch tall along most of the Trombleys' eastern boundary except for the north and south ends, where a barbed wire fence rather than a stockade fence was erected. The stockade fence is made up of solid narrow wooden fence pieces fitted snugly next to each other and flush with the ground. The fence along the Trombley eastern boundary is on the Obolensky property (not on the boundary itself) between 3-12" east of the boundary line. The Obolenskys also put up signs on the side of the fence that faces the Trombley property. The signs said, "NO TRESPASSING, POLICE TAKE NOTICE" and "POSTED, PRIVATE PROPERTY." While the stipulation allowed for the erection of signs, it specified the location of allowed signs. Two of the signs were placed right next to each other in violation of the agreed-upon terms.

The Obolenskys also had the fencing company place a single strand wire fence along the common boundary that is the Trombley north boundary. In addition, they hired Mr. Hopkins to return to the property and put up 13 additional surveyors' pins to mark more clearly and continuously the boundary established by agreement and to supplement the corner pins he had placed as the independent surveyor under the stipulation. During the erection of the fences, Mrs. Obolensky was actively involved with the workers building the fences and she placed herself on the Trombley property at various locations and at various times throughout the process.

On the same day the fence was erected, June 20, 2011, the Obolenskys listed their property for sale. They have since taken it off the market.

Mr. Trombley did not believe that the single strand wire fence on the Trombley north boundary was correctly located on the line, and he ran a straight string along the north boundary from the established northwest corner of the Trombley property to the established northeast corner. The line of the string does not match the Obolensky fence line along the Trombley north

---

[2] Paragraph E of the Order of June 30, 2011 provides: "Obolensky and Trombley shall each be entitled to erect and maintain any fence allowed by law."

4

boundary line. The Trombleys claim that the Obolenskys' fence encroaches on their side of the boundary, and the Obolenskys claim that Mr. Trombley cut saplings and brush on the Obolensky side. Mr. Trombley claims the Obolenskys' fence company did that cutting when it erected the fence.

In July of 2011, the Trombleys had surveyor Short come to the property to check the location of the Obolenskys' wire fence along the north boundary. He found that the wire fence encroaches on the Trombley property at five points along the common boundary line, and the court so finds based on the credibility of the witness. The evidence as to who cut brush and saplings on whose side of the accurate north boundary line is inconclusive. The Court cannot find that either party has proved by a preponderance of the evidence that the other party was responsible for cutting vegetation on the other's side of the boundary line.

The stockade fence complies with Brandon zoning ordinance requirements, and no Town permit was necessary. Permits are only necessary for fences higher than 6 feet 1 inch.

In late July and early August of 2011, the Obolenskys bought white pine trees and hired a contractor to plant approximately 22 12-15' white pine trees on the portion of the high part of their field that is in front of the Trombley house.[3] These trees obstructed the Trombleys' view of the mountains to some degree when planted, and were destined to continue to do so even more as they grow taller. They were and are, however, in keeping with the general surrounding environment, which includes many such trees. They are also set back from the common boundary, and are planted in a staggered, random formation rather than as a solid line. They are planted in roughly 3-4 rows at distances of 20 to 80 feet from the Trombley boundary line. The Trombleys originally sought removal of these trees in their post judgment motion, but no longer do so. From the perspective of the houses on both properties, the trees provide a natural screen so that both parties do not have to look directly at each other and the other party's house, and the trees are compatible with the natural features of the surrounding environment.

The stockade fence the Obolenskys put up on their western boundary has a substantial impact on the Trombley property. Not only does it cut significantly into the ability to see the mountains, it creates a solid enclosure located close to the Trombley house, both in terms of measurable distance and in the context of the characteristics of the general area. Because it is such a tall solid fence, flush with the ground and so high and so close to the house, it creates a sense of confinement and isolation. While the enclosure might provide welcome privacy in an urban environment, it conveys a feeling of entrapment from the Trombley side given the surrounding open land and fields.

From the Obolenskys' Birdcage house and fields, it serves the purpose of blocking all but the top of the Trombley house from view and thereby enhances the privacy for the Obolensky property, as otherwise there is an occupied dwelling at the top of the hill overlooking the Obolensky property. The same purpose is accomplished by the growth of the white pines, and more effectively as they have the potential of growing taller than the fence and completely

---

[3] They also arranged for the planting of 22-23 other trees they purchased, which were planted at other locations on their property, such as near their house and near the gazebo.

blocking the entire Trombley house from view. A lower fence would accomplish the legitimate purpose of marking a division between the properties so that the Obolenskys' guests do not wander onto the Trombley property, and the Obolenskys are assured that no activities from the Trombley side of the boundary, such as mowing, spill over onto the Obolensky side.

Because the stockade fence is set back from the boundary line, the field grass has grown 3 1/2-4' high along the narrow strip (3"-12" wide) between the boundary and the fence. This is aggravating to Mr. Trombley, whose property is otherwise highly groomed, because the tall grass sometimes, depending on the season and height of growth, flops over onto his property, and is both unsightly and an encroachment on the Trombley side of the line. In the summer of 2012, he cut the grass down. Mrs. Obolensky claims that in doing so, Mr. Trombley both trespassed over the boundary and damaged the stockade fence.

The evidence does not support a finding that the fence has been damaged by this grass cutting. There is no reasonable way that the Obolenskys would be able to trim the growing grass on the narrow strip (roughly 3"-12") between the Trombley eastern boundary line and the stockade fence without trespassing on the Trombley land because their own fence is so high and solid and the strip is so narrow. Thus, it is highly likely that every year grass will grow on the strip high enough to flop over onto the Trombley side of the boundary line. The effect is unsightly from the Trombley property, even for persons who may not be as careful groomers as Mr. Trombley.

An impact of the construction of the fence and the way it is located flush with the ground where field grass grows is that the fence and grass create a barrier such that water does not drain freely downhill from the Trombley property. Standing water has pooled on the Trombley lawn during wet periods.

After the Obolenskys planted the 22 white pines near the Trombley eastern boundary in the late summer of 2011, they arranged for the trees to be watered regularly through October. They left Vermont and returned in the spring of 2012. In May and June of 2012, they noticed that some of the pine trees were dying or showed damage. The Obolenskys immediately suspected that Mr. Trombley had poisoned the trees. They believed that because Mr. Trombley worked for the State highway department he must have access to road salt and because he wanted the trees removed, he must have used salt to poison the trees. They also believed that such conduct was consistent with a hostile pattern of conduct on his part toward them demonstrated by mowing on their property, cutting saplings and brush on their property, removing their signs and dumping them on their land, and cutting grass on their land next to the fence.[4] They believed that he did it during the opportunity that was available when the Obolenskys were away over the winter of 2011-2012.

---

[4] The Obolenskys have always blamed Mr. Trombley for knocking down the dilapidated barbed wire fence that previously existed between the parcels. He claims that the posts were rotten and the wind blew it down. This was previously an issue in the case but is no longer an issue after the stipulated Order of June 30, 2011. The Court therefore makes no finding about how the old barbed wire fence came down, but notes that the issue continues to be a source of hostility from Mrs. Obolensky to Mr. Trombley.

6

Mrs. Obolensky first contacted the planting contractor about the problem of the failing trees, and then arborist Warren Spinner. She did not like what Mr. Spinner said and then contacted arborist Christopher Zeoli, who came to the property and advised that the cause of stress and death of some of the trees was likely that they had been planted too deeply. Mr. Zeoli testified at the trial, and the Court finds credible his opinion that trees purchased at nurseries and planted by contractors often die from being planted too deeply. He further testified, and the Court finds, that the effects of too-deep planting often do not appear right away, and can include dieback or death but also limited growth, in which case the tree lives, but does not reach its full growth potential. Mr. Zeoli did not see damage to the grass around the trees, which would be expected if the trees had been poisoned.

Mrs. Obolensky did not follow up with Mr. Zeoli. Instead she contacted another arborist, William DeVos. He visited the property and took samples of soil around the dying trees and had them tested in a lab. He did not find any evidence of poisoning in the soil samples he had collected. In August of 2012, Mrs. Obolensky took samples of her own in the presence of a deputy sheriff whom she hired for the purpose and mailed the samples to a lab at the University of Vermont where they were tested by soil scientist Joel Tilley. The samples from the dead and dying trees showed evidence of concentrations of salt high enough to interfere with plant growth and draw moisture away from the roots. Mr. DeVos testified at the trial, and gave the opinion that the test results from the lab testing of the soil samples taken by Mrs. Obolensky support the conclusion that the cause of death of the trees is likely the application of salt. He took no responsibility for the collection of the soil samples, but testified that his opinion was based solely on the test results of the samples.

The Court finds that the Plaintiffs have not proved by a preponderance of the evidence that the Trombleys poisoned the trees. There is no direct evidence linking them to any contact with the trees or being on the Obolensky land. Such evidence is not necessary, of course, as facts can be proved by circumstantial evidence, but the circumstantial evidence, viewed as a whole, does not satisfy the preponderance of the evidence standard of proof that the Trombleys poisoned the trees. Both Mr. and Mrs. Trombley adamantly deny doing so. Both the Trombleys are more credible than Mrs. Obolensky. Their testimony was consistent internally and with other facts on a wide variety of points over the several days of hearing, whereas Mrs. Obolensky's testimony was quite inconsistent on many occasions and on many points.

Mrs. Obolensky clearly has a long-standing high level of hostility toward Mr. Trombley that colors her perceptions of his conduct. On one occasion prior to the filing of the original lawsuit, she called Mr. and Mrs. Trombley "peasants." The Brandon Police Chief testified credibly that Mrs. Obolensky has called the police on many occasions complaining of wrongdoing on the part of Mr. Trombley, and that all complaints have been investigated and no wrongdoing found except for the cutting of the grass along the base of the stockade fence. The Court finds this credible and evidence of ongoing hostility on the part of Mrs. Obolensky toward Mr. Trombley.

At least three arborists were consulted about the trees on site, and none of them identified poisoning as the cause of the failing trees. The one who gave the expert opinion that the trees

were poisoned by salt did so very clearly by limiting the basis of his opinion to the test results of soil samples, and he was not responsible for collecting those samples. In addition, his own samples did not show signs of salt. While Mrs. Obolensky presented evidence that the soil samples she collected were done in the presence of a deputy sheriff, this was a year after the Obolenskys had accused Mr. Trombley of poisoning the trees. The opportunity had existed for some time for salt to be added to the soil around the trees. While the Court does not find that Mrs. Obolensky did so, the fact that the opportunity was there is part of the overall circumstantial evidence. Mrs. Obolensky has a high degree of vindictiveness toward the Trombleys, particularly Mr. Trombley, and is willing to jump to conclusions and blame him at the slightest opportunity.

In addition, there are other explanations for the death and dieback of the trees. One is that some of the trees were planted too deep, and this is consistent with the opinion of the arborist who first saw the failing trees, and consistent with the fact that not all of the white pines have failed and the fact that at least one of the other trees planted elsewhere on the property has failed. Even if the trees were poisoned, it is possible that it was done by someone else. There were suggestions in the evidence that Mrs. Obolensky had had unpleasant altercations with other neighbors as well, who may have had motive and opportunity to salt the trees.

It is unknown what caused the trees to die, and the Court is not obligated to make a finding of the cause of the failing trees. The only finding of the Court is that Plaintiffs have not proved by a preponderance of the evidence that the Trombleys poisoned their trees.

**Conclusions of Law**

Defendants' Motion to Enforce
As noted in the introduction, Defendants seek enforcement as follows: an injunction for the removal of the stockade fence on the grounds that it is an illegal spite fence; damages for trespass based on encroachment on their land of the wire fence on their northern boundary and an injunction for its removal; damages for trespass by Mrs. Obolensky for entering their property; and damages for a violation of the stipulated Order by the Obolenskys having retained the independent surveyor to place additional boundary pins along the boundary. They also seek attorneys' fees pursuant to the stipulated Order.

The first claim is dependent on whether Defendants have proved that the stockade fence is an illegal fence that is in violation of the stipulated Order. Plaintiffs claim that it is not an illegal fence because it was built in compliance with Town regulations. Defendants did not assert a direct statutory claim for a spite fence in their pleadings.[5] Rather, they argue that they have proved that the fence satisfies the requirements for a spite fence under 24 V.S.A. § 3817, and thus it is not a fence "allowed by law" and is therefore in violation of the terms of the

---

[5] **24 V.S.A. § 3817. Unnecessary fence; maintenance prohibited; penalty**: "A person shall not erect or maintain an unnecessary fence or other structure for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air. A person who violates a provision of this section shall be fined not more than $100.00."

8

stipulated Order in the case. The Court rules that any fence that is subject to removal by court injunction is not "allowed by law" within the meaning of the stipulated Order. The Vermont Supreme Court has upheld an injunction requiring the removal of a spite fence. *Alberino v. Balch,* 2008 VT 130, ¶ 10, 185 Vt. 589. Thus, if the Trombleys have proved that the stockade fence is a spite fence within the meaning 24 V.S.A. § 3817, it is not allowed by law within the meaning of the stipulated Order, even though it is not in violation of governmental regulations, and an injunction may issue to require its removal as a matter of enforcement of the stipulated Order.

In ruling on whether or not the Obolenskys have erected a spite fence, the Court is mindful of the fact that the Obolenskys were specifically permitted by the stipulated Order to erect a fence and everyone knew they planned to do so. In addition, it is reasonable that they would wish to, and they have the right to, put up a fence that serves the purpose of separating their property from the Trombleys'. While the trees they planted provide screening, they do not serve the function of marking separation of the two parcels.

The fact that there was a valid reason for some kind of a fence does not mean that the fence that was erected was not a spite fence, however. The Vermont Supreme Court has not specifically ruled that a fence is only a spite fence if its *sole* purpose is to annoy. *Id.* at ¶ 9. The Court has, however, noted with apparent approval that there are "cases holding that a fence with a *primary* purpose to annoy is also subject to abatement." *Id.* Furthermore, it has noted that "[t]he cases are uniform in their approval of reliance on the history of relations between neighbors as evidence of intent to annoy." *Id.*

There are several facts that show vindictiveness or intent to annoy on the part of the Obolenskys that lead the Court to conclude that Defendants have proved that the fence is a spite fence, at least as to some of its characteristics. One is the timing and manner of erection. The very morning after the stipulation was signed, at 5:30 a.m., the Obolenskys had noisy weedwhacking done as the first act of erecting the fence. Mrs. Obolensky had a very visible presence throughout the erection of the fence, and trespassed on several occasions onto the Trombley property despite the specific terms of the stipulation that had just been signed. The history of her hostility to the Trombleys, including specifically the events of the wine glass incident, is relevant to show that these things were done with a specific intent to annoy. The placement of the No Trespassing and Private Property signs were in violation of the specific terms of the stipulated Order and served no useful purpose in light of the stipulated Order and show a deliberate attempt to be provocative.

Another salient fact is that the Obolenskys erected the tall, solid stockade fence in addition to planting 22 screening trees, which in and of themselves were sufficient to satisfy the goal of creating privacy between the properties. Finally, there is the fact that the fence was constructed in such a manner as to guarantee that the Trombleys would have to look directly at an unsightly thatch of weeds at the base of the stockade fence. The grass grows high enough to flop over onto the Trombley property for most of the nearly 500 foot boundary. The thatch could never be legally trimmed by either the Obolenskys or the Trombleys because of the placement of the stockade fence and the fact that it is flush with the ground. Its effect is only visible from the Trombley property and is wholly contrary to the manicured style of the Trombleys' property.

9

The creation of this impact on the Trombleys as part of the fence construction is further evidence of an intent to annoy.

Under these circumstances, the Court concludes that as in *Alberino v. Balch,* the stockade fence *as erected*--a six-foot high solid barrier that boxed the Trombleys in and created an unsightly obstruction of the Trombleys' view--served no useful purpose and was intended to annoy. That does not mean that another form of fence would also be a spite fence. On the contrary, if the Obolenskys had replaced the prior barbed wire fence or erected the same type of fence they erected on the Trombley north boundary, such a fence would serve a legitimate purpose and would not have the characteristics of a spite fence. In this case, it is not necessary for the entire fence to be removed. The aspects of the fence that show vindictiveness or intent to annoy and that interfere with the Trombleys' enjoyment of their own property can be abated by an injunction that does not require removal of the whole fence, but only those characteristics.

The height is a particular annoyance that is unnecessary, as it is much higher than necessary for the purpose of marking the division between the properties, and it obstructs the Trombleys' access to the light and air and view of the mountains and openness of the surroundings to a much greater degree than necessary. The trees planted by the Obolenskys are sufficient to create a visual barrier between the users of both properties, so the extra height of the solid stockade fence is an unnecessary characteristic that has little positive effect on the Obolenskys' use of their property, but a significantly negative effect on the Trombleys' use of theirs. The extra height can be abated without removing the whole fence or interfering with its legitimate purpose. In determining a reasonable height, it is helpful to refer to Vermont statutory law relating to boundary fences, which establishes a fence of four and one-half feet in height as being a "sufficient" fence. 24 V.S.A. § 3801.[6] This would be a reasonable height that would accomplish the Obolenskys' legitimate purpose and would abate the effect of the unnecessary and spiteful height.

Defendants have shown that another consequence of the stockade fence as built is that it interferes with the natural flow of water on the slope and creates pooling water on the Trombley land. A landowner is not allowed to divert natural water drainage to neighboring land to the detriment of the neighbor, and injunctive relief is available as a remedy for such conduct. *Powers v. Judd,* 150 Vt. 290, 292 (1988). By Mr. Trombley's own testimony, it appears that this effect can be eliminated by reducing the water barrier created by the fact that the solid stockade fence is flush with the ground and combines with the thick field grass growing at its base to prevent drainage. Plaintiffs are thus enjoined from allowing this situation to continue.

Again, it is not necessary for the fence to be removed entirely. A few inches of the base can be cut away to permit natural drainage to take place underneath the fence. This would also create an opening sufficient for the Obolenskys to trim the grass on their side of the boundary so that it does not fall onto the Trombley land. Consequently, the Court concludes that the Trombleys are entitled to an injunction enjoining the Obolenskys from maintaining the stockade fence beyond November 15, 2013 to a height greater than 4 ½ feet, and from maintaining the

---

[6] While the statute makes reference to the enclosure of animals, it does not restrict the definition of a "sufficient" fence to such a purpose.

10

bottom six inches of the vertical fence pieces.  This provides for a sufficient period of time for the top and bottom of the stockade fence to be removed to bring it in compliance with the injunction to be issued based on this Decision.  In order to implement effective enforcement of the injunction, for any day beyond November 15, 2013 that the injunction is not observed, the Obolenskys will be subject to a daily fine of $50.00, and shall be responsible for any attorneys' fees incurred by the Trombleys in enforcing the injunction.

Turning to Defendants' claim for enforcement as to their northern boundary line, Defendants proved that Plaintiffs erected a single strand wire fence on the Defendants' northern boundary line that encroached over the actual boundary line at five locations.  Thus, Defendants are entitled to an injunction for the fence to be removed and relocated, and damages.  The Court will enjoin the Plaintiffs from maintaining a fence on the Trombley northern boundary that encroaches on Trombley land after October 15, 2013.  This gives ample time to arrange to have the fence relocated so that it does not encroach.  If the encroachments of the Obolensky fence on the Trombley north boundary are not removed by October 15, 2013, then the Trombleys are authorized to remove the encroaching fenceline themselves.  With respect to damages for trespass, the Trombleys have shown no compensable damages other than the fact of relatively minor encroachment.  Therefore, the Court awards only nominal damages of $100.00.

Defendants proved that during the erection of the fences, Mrs. Obolensky placed herself on the Trombley property at various locations.  While she should have avoided doing so or sought an exception for the purposes of building a fence, which everyone knew was going to happen, she did not do so but simply trespassed in an intentional and visible way.  Thus the Trombleys are entitled to damages.  Defendants have not shown a basis for compensable damages; thus they are entitled to only nominal damages of $100.00.

Defendants claim that it was a violation of the stipulated Order for the Obolenskys to contact Mr. Hopkins after he had completed the placement of the corner pins pursuant to the stipulation, and have him return to the property to place 13 additional boundary pins.  The Defendants have not shown that this conduct amounted to a violation of the stipulated Order.  While it is true that under the Order, neither party was to have independent contact with Mr. Hopkins, the purpose of that provision appears to have been to prevent communication that might interfere with the work and/or increase cost before the placement of the corner pins was completed.  However, there was no prohibition against contacting him *after* all his agreed-upon tasks defined in the stipulation were completed, and no prohibition against placement of additional boundary pins.  Therefore, Defendants have not proved a violation of the stipulated Order in this way.

With respect to the Trombleys' claim for attorneys' fees.  Paragraph D of the June 30, 2011 Order provides:

> Obolensky and Trombley shall not cross the boundary between their lands onto the lands of the other for any purpose.  A violation of this provision shall be a trespass and result in the Court having all powers of enforcement, including contempt, and each Party expressly retains all right to an award of damages and any other equitable or legal relief afforded under the law.  The Parties hereby

11

agree that any violation of this provision shall be enforced by an injunction, in addition to all other remedies, each Party acknowledging that a violation of any term hereof shall cause the other irreparable damage for which an injunction is the only effective relief. Notwithstanding the necessity of an injunction, if either Party violates this provision, the other Party shall recover from the other Party all legal costs incurred in connection with enforcement, including, but not limited to, reasonable attorney's fees (whether for a court proceeding or any other steps to enforce any term herein or obtain compliance), expert costs, and court fees.

Thus the Trombleys are entitled to attorneys' fees for that portion of the fees attributable to the successful claims for trespass. They shall submit a request for fees attributable only to their successful claims for trespass, and not for other matters, based on time and billing records. This must be submitted within 15 days, or the claim will be deemed waived. Upon submission, the Obolenskys will have 15 days to file any objection to the amount claimed. If none is filed, any objection will be deemed waived.

Plaintiffs' Motion for Contempt

Plaintiffs seek damages from Defendants for trespass for cutting vegetation and depositing debris on Plaintiff's land to the north of Defendants' land, and contempt for cutting grass on Plaintiffs' side of the boundary line (the strip between Plaintiffs' fence and the boundary line) to the west of Defendants' eastern boundary line. They also seek an injunction against further trespasses, punitive damages, and attorneys' fees as well as costs.

As the findings show, Plaintiffs have not proved their claim that Defendants trespassed by cutting saplings and depositing debris north of the Defendants' north boundary line. With respect to the claim of contempt based on grass cutting, Plaintiffs have shown that Mr. Trombley knowingly cut the high grass that grew on the narrow strip between the fence and the boundary. To the extent that the high grass had flopped onto the Trombley property, the Trombleys were entitled to remove such encroaching grass. "[W]here a tree stands wholly on the ground of one and so is his tree, any part of it which overhangs the land of an adjoining owner may be cut off by the latter at the division line." *Cobb v. Western Union Telegraph Co.,* 90 Vt. 342, 344 (1916).[7] Even if they only cut the encroaching portion, natural growth of untended grass would likely result in ongoing encroachment.

Thus it was not unreasonable for the Trombleys to make a preventive cut to prevent such encroachment, rather than have to trim tiny amounts of encroaching growth on an ongoing basis throughout the growing season. This is a natural consequence of the untenable situation created by the Obolenskys on the boundary: they erected a solid fence flush with the ground at a location where they cannot themselves access the grass to prevent it from growing and flopping onto the Trombley land. They cannot therefore claim intentional contempt on the part of the Trombleys when the Trombleys took reasonable measures to prevent encroachment that was bound to occur by the natural and predictable growth of grass. Therefore, while the act of cutting was willful, the facts do not show a willful intent to violate the terms of the stipulated

---

[7] While the case relates to growth of overhanging tree branches, its principle is equally applicable to grasses that grow tall enough to encroach on a neighbor's property.

12

Order.  The Obolenskys were in a position to prevent this problem by erecting a fence in a manner that would not create the trespass onto the Trombley land.  The Injunction to be issued pursuant to this Decision should prevent the recurrence of this problem.

Although the Court does not find that contempt is proved, the Mr. Trombley's act of cutting grass on the Obolensky side of the boundary line was a trespass in violation of the stipulated Order.  Thus the Obolenskys are entitled to damages.  They have not shown a basis for compensable damages; thus they are entitled to only nominal damages of $100.00.

The Obolenskys are entitled to attorneys' fees for that portion of the fees attributable to this successful claim for trespass.  They shall submit a request for fees attributable only to the successful claim for trespass, and not for other matters, based on time and billing records.  This must be submitted within 15 days, or the claim will be deemed waived.  Upon submission, the Trombleys will have 15 days to file any objection to the amount claimed.  If none is filed, any objection will be deemed waived.

Claim in Plaintiffs' Amended Complaint
As stated in the Findings of Fact, Plaintiffs did not prove by a preponderance of the evidence their claim that Defendants poisoned their white pine trees.  Judgment will be entered for Defendants on this claim.


**ORDER**
Based on the foregoing,

1.  Defendants' Motion to Enforce filed August 5, 2011 (# 36) is *granted* on the terms specified above;
2. Plaintiffs' Motion for Contempt filed September 8, 2011 (#38) is *denied;*
3. Plaintiffs' Motion for Contempt filed August 3, 2011 (#41) (grasscutting) is *denied;*
4. Defendants' Motion for Additional Contempt filed August 10, 2011 (#42) (surveyor pins) is *denied*; and
5. Defendants are entitled to judgment on Plaintiffs' new claim asserted in the Amended Complaint (tree poisoning) filed August 29, 2012.

If either party seeks attorneys' fees, they shall submit their request as described above within 15 days.  After determination of the amount, if any, the Court will issue an injunction and monetary judgment based on the above findings of fact and conclusions of law.

Any party is invited to submit a proposed form of Injunction and Judgment, and serve a copy on the opposing parties or attorney.  Any objection must be filed within five business days.

Dated this 18th day of September, 2013.


_____
Hon. Mary Miles Teachout
Superior Judge


13